2003 ME 99

**BENTON FALLS ASSOCIATES**

v.

**CENTRAL MAINE POWER COMPANY.**

Supreme Judicial Court of Maine.

Argued: June 10, 2003.
Decided: Aug. 1, 2003.

Todd S. Holbrook (orally), Bernstein, Shur, Sawyer & Nelson, Portland, for plaintiff.

Catherine R. Connors (orally), William D. Hewitt, Pierce Atwood, Portland, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

**1.** Benton Falls is a "qualifying facility" pursuant to the Public Utility Regulatory Policies Act of 1978 (PURPA), 16 U.S.C.A. §§ 2601–2645 (2000 & Supp.2003), 35–A M.R.S.A.

LEVY, J.

[¶ 1] Central Maine Power Company (CMP) appeals from a summary judgment entered in the Superior Court (Cumberland County, *Cole, J.*) in favor of Benton Falls Associates (Benton Falls) in a contract dispute concerning the prices for electrical power indexed to cost calculations established by the Public Utilities Commission (PUC). CMP argues that the court erred when it (1) determined as a matter of law that the parties' 1989 amended contract indexed prices to "avoided costs" which had been approved by the PUC in 1989, and (2) awarded Benton Falls its costs, including attorney fees, for opposing CMP's motion for reconsideration. We conclude that a summary judgment should not have been entered because the parties' 1989 contract is ambiguous and the material facts necessary to interpret it are disputed. We therefore vacate the judgment.

## I. BACKGROUND

[¶ 2] Benton Falls owns and operates a 4.3 megawatt hydroelectric generating facility in Benton. Under federal and state laws, Benton Falls is a "qualifying facility" (QF) which entitles it to sell electrical power to a utility at rates that reflect the utility's "avoided costs."[1] At the time Benton Falls first contracted to sell power, "avoided costs" were defined as "the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility ... such utility would generate itself or purchase from another source." Me. P.U.C. Reg. 36 § 1(A)(2) (May 13, 1981) (current version at 360 § 1(A)(3) (March

§ 3303(7) (Pamph. 2002) and Chapter 360 of the Rules of the Maine Public Utilities Commission (PUC).

22, 1998)). The PUC establishes avoided costs based on estimates that utilities must submit annually. To calculate avoided costs, 50 megawatt increments of electricity, known as decrements, are subtracted from the utility's hypothetical plan to meet its own anticipated electricity needs, known as its "base case resource plan."

[¶ 3] In October 1984 Benton Falls entered into a contract to sell electrical power to CMP from late 1987 through 2007. The contract set prices for the years 1988 through 2000, and indexed prices from 2001 through 2007 to avoided costs that would be established by the PUC in the future. The contract described these rates as 75% of the " 'standard long-term avoided cost rates' established by the ... PUC for the second 50 megawatt decrement, or the decrement which includes the second 50 megawatts if a second 50 megawatt decrement is not used." Prior to 1986, the PUC held several avoided cost proceedings in which it established avoided costs for the first decrement through 1997, and for the second, third, and fourth decrements through 1998. In 1986 the PUC established avoided costs for the first decrement for 1998 through 2000, for the second, third, and fourth decrements for the period 1999 through 2000, and for four new decrements, identified as the fifth, sixth, seventh, and eighth decrements, for the period 1986 through 2000.

[¶ 4] Effective March 1987, the PUC required utilities to file avoided cost estimates for at least two decrements of capacity over a 30-year period, instead of the 15-year period previously required. Me. P.U.C. Reg. 36 § (3)(C)(5) (March 28, 1987). To conform with this new requirement, CMP filed avoided cost estimates in October 1987 for 1988 through 2017 based on four new 30-year decrements, labeled 87–A, 87–B, 87–C, and 87–D. CMP explained the change in its proposed decrement scheme as follows:

In past avoided cost filings, decrements were numbered 1 through 8 and calculated for 15 years. The year and letter designations now reflect the fact that new 30-year decrements do not build upon prior avoided cost estimates, but upon the actual contracts that resulted from those calculations. The base case resource plan includes all existing contracts, including cogeneration and small power production from prior decrements. Therefore, the next four decrements are the next four 50 MW blocks calculated from this base case and are related to prior decrements only to the extent that contracts based on previously calculated avoided costs now are included in the base case resource plan.

[¶ 5] In its filing, CMP stated that "Decrements 87–A and 87–B correspond to the two decrements previously designated as Decrements 7 and 8." CMP also requested that the PUC approve the Decrement 87–A avoided costs as the avoided costs for the extended years of Decrement 1, Decrement 2, and Decrement 3.

[¶ 6] In spring 1989, before the PUC approved any avoided costs in Docket No. 87–261, the parties entered into an amended power purchase agreement (the amended contract). It provided that for the period beginning January 1, 1999, and ending December 31, 2007, certain rates be paid by CMP:

*shall equal 75% of the so-called "standard long-term avoided costs" established by the [PUC] for the decrement which includes the second 50 megawatts and expressed in cents per kilowatt-hour,* established for each of the years through December 31, 2007.

(Emphasis added). This provision differs from the corresponding provision in the original contract, which indexed the rate to

" 'standard long-term avoided cost rates' established by the ... PUC for the second 50 megawatt decrement, or the decrement which includes the second 50 megawatts if a second 50 megawatt decrement is not used." Elsewhere in the amended contract, the parties referred to the seventh decrement of avoided costs as "now known as Decrement 87–A."

[¶ 7] In July 1989 the PUC approved CMP's avoided costs through 2017 for Decrements 87–A, 87–B, 87–C, and 87–D. The PUC's order closing the case for Docket No. 87–261, however, stated the following:

In this avoided cost proceeding, the only unresolved issue is whether the Commission, in this case, should establish avoided cost rates for decrements established in previous Commission avoided cost proceedings for certain years beyond the 15 years that had been set by the Commission. These years have commonly been called the "out years." All parties addressing this issue agree that these rates should be set at some time. They disagree as to whether they should be set in this case or in some subsequent case. The reason they must be set is that nine contracts in the First, Second and Third Decrement have incorporated Commission-established avoided cost rates for these out years, even though they had not yet been set.

In March 1990, the PUC closed the proceeding and instructed CMP to submit data for avoided costs for extended decrements at the outset of its next avoided cost case.

[¶ 8] In January 2001, after CMP refused to pay prices indexed to Decrement 87–B established in Docket No. 87–261, Benton Falls filed a complaint in the Superior Court requesting a declaratory judgment setting forth CMP's obligations under the amended contract and seeking money damages for breach of contract. CMP answered and counterclaimed, seeking a declaratory judgment that the PUC did not establish long term avoided costs for the "decrement which includes the second 50 megawatts" in Docket No. 87–261, and that the avoided costs set by the PUC in a more recent proceeding, Docket No. 2000–10, established the rate which applies under the amended contract.[2] The parties filed cross-motions for summary judgments. After a hearing, the court entered a summary judgment in favor of Benton Falls, concluding that, in Docket No. 87–261, the PUC established the avoided costs "for the decrement which includes the second 50 megawatts" as Decrement 87–B and that those rates were incorporated into the amended contract.

[¶ 9] CMP filed a motion for reconsideration of the summary judgment, but the court denied the motion and awarded Benton Falls the costs of opposing the motion, including attorney fees. The parties then filed a stipulation to entry of judgment as to the breach of contract claim. The court entered judgment for Benton Falls in the amount of $544,840.55. CMP now appeals.

## II. DISCUSSION

■ [¶ 10] We review the grant of a summary judgment de novo for errors of law and examine the statements of material facts to determine if a genuine issue of material facts exists. *Levine v. R.B.K. Caly Corp.*, 2001 ME 77, ¶ 4, 770 A.2d 653, 655. "A material fact is one having the

---

2. In a second count to the counterclaim, CMP sought a declaratory judgment that if the PUC did not establish avoided costs applicable to the 1989 agreement in Docket No. 2000–10, an attachment to the amended contract, which establishes a methodology for determining the applicable avoided costs, applies.

potential to affect the outcome of the suit," and "[a] genuine issue exists when sufficient evidence supports a factual contest to require a factfinder to choose between competing versions of the truth at trial." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573, 575. We review the record in the light most favorable to CMP, against whom the summary judgment was entered. *Kezer v. Mark Stimson Assocs.*, 1999 ME 184, ¶ 11, 742 A.2d 898, 902.

[¶ 11] CMP argues that the court erred when it concluded as a matter of law that the 1989 amended contract indexed prices to avoided costs approved by the PUC for Decrement 87–B in Docket No. 87–261. The portion of the 1989 amended contract at issue is the meaning of the phrase "the decrement which includes the second 50 megawatts." Benton Falls asserts that this language reflects that when the parties entered into the amended contract, they were cognizant that CMP had submitted to the PUC estimated avoided costs for a new decrement scheme based on a new 30–year base case resource plan, and that the parties thereby indexed prices to Decrement 87–B which encompassed the second 50 megawatts of that base case resource plan. Under Benton Falls's view, it does not matter whether Decrement 87–B represents the second or the eighth decrement of all decrements approved by the PUC because it is indisputably "the decrement which includes the second 50 megawatts" approved by the PUC in 1989, just

a few months after the formation of the amended contract.

[¶ 12] CMP interprets the same contract language as indexing prices to avoided costs for the second 50 megawatts of power (i.e. the decrement that includes the 51st to 100th megawatts) and that Decrement 87–B cannot apply because the four decrements established in Docket No. 87–261 merely supplemented, but did not replace, the preexisting 15–year decrement scheme.[3] It follows from this view that Decrement 87–B is not "the decrement that includes the second 50 megawatts" because it replaced Decrement 8 and is, therefore, the decrement which contains the eighth 50 megawatts of power.

[¶ 13] Whether contract language is ambiguous is a question of law. *Acadia Ins. Co. v. Buck Constr. Co.*, 2000 ME 154, ¶ 8, 756 A.2d 515, 517. Contract language is ambiguous "if it is reasonably susceptible to different interpretations." *Id.* ¶ 9, 756 A.2d at 517. While interpretation of unambiguous contract language is also a question of law, interpretation of ambiguous contract language is a question of fact. *Id.* ¶ 8, 756 A.2d at 517. Because Benton Falls and CMP's contradictory interpretations of the amended contract are both reasonable and rest largely on competing views of the parties' intentions, the amended contract language is ambiguous. Moreover, there exist genuine issues as to the material facts necessary to determine the amended contract's meaning and which PUC Order is applicable.[4] In addition, if

---

3. In 1997, Maine enacted the Electric Industry Restructuring Act, deregulating electric generation services and allowing for retail competition beginning in March 2000. 35–A M.R.S.A §§ 3201–3217 (Pamph. 2002); P.L. 1997, ch. 316. Consequently, the PUC adopted a market-based avoided cost methodology that resulted in lower rates, which were the same for every decrement. PUC Order Docket No. 97–794; Me. P.U.C. Reg. 360 § 3(B)(1)-(2) (March 22, 1998). For example,

the 2001 rate for Decrement 87–B, approved in Docket No. 87–261, was 7.61 cents per kilowatt-hour; in contrast, the 2001 rate for Decrement 2, approved in Docket No. 2000–10, was only 2.84 cents per kilowatt-hour.

4. For example, in its Rule 56(f) statement, Benton Falls asserted that the amended contract:

    deletes reference to the "second 50 megawatt decrement" and refers only to the "de-

it is ultimately determined that CMP's interpretation of the amended contract is accurate, a separate genuine issue of material fact also exists regarding whether the PUC established the 30–year decrements in Docket No. 87–261 to stack onto the earlier 15–year decrements, making Decrement 87–B the eighth 50 megawatts of the earlier avoided cost scheme, or to stand alone, making Decrement 87–B the second 50 megawatts of a new avoided cost scheme.

[¶ 14] We conclude that the court erred as a matter of law when it determined that the amended contract unambiguously indexed prices to avoided costs approved by the PUC for Decrement 87–B in Docket No. 87–261. Given that a summary judgment should not have been entered in favor of Benton Falls, we also vacate the award of costs and attorney fees for opposing CMP's motion for reconsideration.

[¶ 15] CMP argues in the alternative that if it is unclear when the PUC set avoided costs for "the decrement which includes the second 50 megawatts," then, in accordance with the principles of primary jurisdiction, the matter should be referred to the PUC for clarification. Because the present case concerns a contract dispute more within the particular expertise of the courts than the PUC, we are not persuaded that the principles of primary jurisdiction apply See In re Megan–Racine Assocs., Inc., 180 B.R. 375, 381 (Bankr. N.D.N.Y.1995) (listing factors for determining the applicability of the primary jurisdiction doctrine). Moreover, the PUC has already declined on two separate occa-

crement which includes the second 50 megawatts." Thus, in the amendment, the parties did not refer to "decrement 2," as the Commission had done in its May 27, 1986 Order and as CMP had done in the stipulation filed prior to and incorporated into that Order, but rather referred to "the decrement which includes the second 50 megawatts."

In its response, CMP disputed this statement of fact, quoting a greater portion of the sentence from the amended contract reflecting that having first referred to the "second 50 megawatt decrement," the amended contract subsequently refers to CMP's "second decrement."

In addition, Benton Falls asserted that in Docket No. 87–261, "Decrements 87–A, 87–B, 87–C, and 87–D represented, respectively, the first, second, third and fourth 50 MW decrements of load from the Base Case for the years for which no rate had yet been set." CMP denied this assertion, responding that the cited portion of the record does not support the proposition asserted by Benton Falls. The cited portion of the record—CMP's 1987 submission to the PUC proposing decrements 87–A through 87–D—refers to these as "the next four 50 megawatt blocks calculated from this [new] base case and are related to prior decrements only to the extent that contracts based on previously calculated avoided costs now are included in the base case resource plan." While Benton Falls interprets this language as proving that the new decrements represent the first through fourth 50 megawatt blocks of the new base case resource plan, CMP interprets this language as confirming that the new decrements were to stack onto the earlier ones, which were incorporated into the new base case resource plan.

Further, CMP, citing the affidavit of one of its employees, asserted that the PUC's order in Docket No. 2000–10 established the rates applicable to "power purchase agreements that rely on PUC-established avoided costs for 2001 and beyond, such as the Benton Falls Contract." Benton Falls denied that the order in Docket No. 2000–10 controlled, stating that CMP's assertion "assumes the ultimate conclusion (not fact) at issue here; whether the PUC set standard long-term avoided costs in an earlier docket [No. 87–261] that were automatically incorporated by reference into the parties' contract." The Superior Court rejected CMP's characterization regarding the significance of the order in Docket No. 2000–10 because, it concluded, "nowhere do the parties' facts assert that PUC ever explicitly approved those rates [set in No. 2000–10]." However, CMP did assert in its statement of material facts and Benton Falls admitted that Benton Falls "did not seek judicial review of the PUC decisions in Docket no. 2000–10."

sions to address this issue.[5]

The entry is:

Judgment and award of costs and attorney fees vacated. Remanded to the Superior Court for further proceedings consistent with this opinion.

**5.** In a March 1998 order, the PUC explained why its intervention in this contract dispute is inappropriate:

The Consolidated QFs, Benton Falls Associates (commenting separately) and RWS urged the Commission to acknowledge in this rulemaking that so-called "out-year" or "orphan decrement" avoided costs have already been established. This matter concerns language in certain QF contracts describing the rates for purchases for years in which avoided costs had not been determined at the time the parties executed the initial contracts....

... [A]lthough the QFs characterize their request as asking the Commission to state what it did in a past case, the request is in the nature of a contract interpretation to resolve a dispute. The official actions of the Commission are described in its written decisions. Any further description of what it did in a prior case would essentially include consideration of whether rates have already been set for purposes of the contracts in question. In effect, this would involve contract interpretation.

It is unclear whether the Commission has jurisdiction to interpret or otherwise act to resolve disputes regarding existing QF contracts.

PUC Order of March 10, 1998, in Docket No. 97–794 at 27–28. The PUC again declined to address the question of the applicability of Decrement 87–B to existing contracts in connection with CMP's 2000 rate proceeding. PUC Order of May 16, 2000, in Docket No. 2000–10 at 2.