STATE OF MAINE

YORK, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-03-216

SANFORD HOUSING AUTHORITY,

      Plaintiff

v.

                               **ORDER**

PERKINS PROPANE, INC.,

      Defendant

SEP 24 2004

This case comes before the court on Plaintiff Sanford Housing Authority's Motion for Summary Judgment. Following hearing, the Motion is Denied.

## FACTS

Plaintiff Sanford Housing Authority (SHA) owns and manages East Side Acres and Sunset Towers apartments. In 1987, SHA entered into a three-year contract with Defendant Perkins Propane (Perkins) to supply those units with propane gas. The contract required the supplier to provide all equipment necessary for propane storage and delivery to the apartments. As the successful bidder, Perkins paid for the equipment currently on site, installed by SHA's previous contractor, Eastern Propane Gas. Eventually Perkins replaced that equipment with its own, at a cost of over $34,000.

SHA did not seek new bids on the propane contract after the first three years expired, and continued to use Perkins as its supplier until 2003. In 2003, SHA once again invited bids on the propane contract for the apartments. The new invitation to bid specified upgraded equipment different from that installed by Perkins. Perkins notified SHA it would not be submitting a bid, and asked SHA whether it would be exercising

its option, under Paragraph (3) of the 1987 contract, to purchase the equipment Perkins had installed. SHA notified Perkins it would not be exercising that option. In putting the contract out to bid, SHA did not provide prospective bidders with the cost of purchasing Perkins' equipment and did not tell bidders that the purchase was required. A successful bidder was eventually identified who did not purchase Perkins' equipment.

Perkins maintains that, under the terms of the 1987 contract, SHA was required to provide the purchase price of Perkins' equipment to prospective bidders, who were obliged to include the purchase price in their bids. Perkins locates these requirements in paragraph (3) of the contract, which reads:

> (3) The parties hereby agree that the AUTHORITY shall have the option to purchase from PERKINS PROPANE all of the equipment installed by PERKINS PROPANE in connection with this Contract at a price to be negotiated between the parties at that time, . . . PERKINS PROPANE further agrees that the AUTHORITY shall be allowed to submit to bid in three (3) years this account and that PERKINS PROPANE will provide the purchase price to the AUTHORITY for the equipment so that any prospective bidder can include in its bid the cost of purchasing this equipment from PERKINS PROPANE.

SHA disputes Perkins' reading of these terms, and sued for declaratory judgment on the issue of its obligations to Perkins, if any, under the 1987 contract. On April 6, 2004 SHA filed this motion for summary judgment.

## DISCUSSION

In a motion for summary judgment, the moving party asserts that no genuine issue of material fact exists and the judgment may be rendered as a matter of law. Darling's v. Ford Motor Co., 2003 ME 21, ¶ 4, 817 A.2d 877, 879.

SHA contends it is undisputed that the 1987 contract between the parties has expired, or alternatively, that the express terms of Paragraph (3) in the 1987 contract in no way obligate SHA to pass on the cost of Perkins' equipment to a new supplier. Perkins

2

argues that the relationship between the parties was governed by the terms of their 1987 contract, and that the express language of Paragraph (3) favors Perkins, or alternatively, is ambiguous.

A. The Parties' Three-Year Contract.

The law of contract recognizes that parties who have made an express contract for a stated period of time frequently proceed with performance after expiration of that time "without making any new express agreement, of extension or otherwise." Corbin, A. L., Corbin on Contracts, § 1.19 (Rev. ed. 1993). "From such continued action a court may infer that the parties have agreed in fact to renew the . . . contract for another similar period." Id. A number of jurisdictions have held that:

> Where after the expiration of a contract fixing the reciprocal rights and obligations of the parties, they continue doing business together, the conduct of the parties may at times permit, or even constrain a finding that the parties impliedly agree that their rights and obligations in connection with such business should continue to be measured as provided in the old contract.

Twitchell v. Pittsford, 106 A.D.2d 903, 905 (N.Y. App. Div., December 14, 1984). *See, e.g.,* Steed v. Busby, 593 S.W.2d 34 (Ark. 1980); Steranko v. Inforex, 362 N.E.2d 222 (Ma. 1977); Town of Webster v. Village of Webster, 720 N.Y.S.2d 664 (App. Div. 2001)(holding an important kind of implied-in-fact contract may arise when parties continue performance after an express contract has expired).

In Maine, the Law Court recognizes that "the facts and circumstances surrounding the conduct between the parties can form a binding, implied-in-fact contract." Nightingale v. Leach, 2004 ME 22, ¶ 4, 842 A.2d 1277, 1279 (citations omitted)[1]. "Whatever may be said for the difference between an express contract and an implied-in-fact contract, '[t]he distinction involves no difference in legal effect.'" Id.

---

[1]    *See, e.g.* Terrio v. Millinocket Cmty. Hosp., 379 A.2d 135, 138 (Me. 1977); Lawson v. McLeod, 152 Me. 67, 69 123 A.2d 199, 200 (1956).

3

(citing Restatement (Second) of Contracts § 4 cmt. a (1981)(emphasis omitted)). An implied-in-fact contract contains all the necessary elements of a binding agreement, but its terms are inferred from "circumstances, including course of dealing, or usage of trade or course of performance." Restatement (Second) of Contracts § 5 cmt. a. (cited in Taliento v. Portland West Plan. Council, 1997 ME 194, ¶ 15, 705 A.2d 696, 700 (Lipez, J., dissenting)). Thus, the Law Court found an implied-in-fact contract when both parties to an apartment management dispute "believed and intended that they were still operating under a contractual relationship based on the terms of [an inapplicable] written document." Nightingale, 2004 ME 22, ¶ 4, 842 A.2d at 1279.

The parties do not dispute that the 1987 contract stipulated a term of three years. The parties disagree about whether the 1987 contract continued to govern their relationship after 1991. Here, it is undisputed that SHA and Perkins chose to continue their arrangement, whereby Perkins stored, delivered and supplied all propane requirements to the two SHA properties for some twelve years beyond the three-year term of their 1987 contract. Neither party maintains that the 1987 contract was expressly extended for an additional term, altered, revoked, or that a new contract replaced it. The parties adjusted the price term of the 1987 contract to accommodate the changing price of propane, but otherwise did not change their understanding of their reciprocal responsibilities or alter their course of conduct. There is no evidence that the express terms of the 1987 agreement were treated by either party as having expired. In 2003, after deciding not to bid on the contract, Perkins inquired about and received responses from SHA that expressly referred to SHA's option to purchase the equipment under Paragraph (3) of the 1987 contract. Only when Perkins expressed its expectation concerning reimbursement from new bidders, did the parties' differing interpretations of Paragraph (3) come to light. With no express evidence to the contrary, a court could

4

reasonably infer that both parties intended and their course of conduct suggested, that the 1987 contract continued to govern their reciprocal obligations under an implied-in-fact contract as they prepared to terminate their relationship in 2003.

Because there is a genuine issue of material fact concerning whether SHA and Perkins' contractual relationship was terminated in 1991 or was governed by an implied-in-fact contract, summary judgment cannot be granted on this basis.

## B. The Terms of Paragraph (3) in the 1987 Contract.

Both parties maintain the language of Paragraph (3) is clear and unambiguous; however, the parties differ sharply as to which of them is favored by the "express" language of that paragraph. The parties agree that the first sentence of Paragraph (3) creates an option in favor of SHA to purchase Perkins' equipment installed at SHA apartments, along with a method for determining its price.[2] A dispute arises concerning the meaning of the second sentence of Paragraph (3), which reads as follows:

> "Perkins Propane further agrees that the AUTHORITY shall be allowed to submit to bid in three (3) years this account and that PERKINS PROPANE will provide a purchase price to the AUTHORITY for the equipment so that any prospective bidder can include in its bid the cost of purchasing this equipment from PERKINS PROPANE."

SHA contends the express language of that sentence imposes no affirmative obligation on SHA, but rather, an option to provide the price for Perkins' equipment to

---

[2] There is little disagreement that Perkins retained ownership of its equipment during its contract with SHA. In paragraph (1), Perkins agrees to supply a complete list of "all equipment **leased** to the AUTHORITY" that "shall be attached hereto and labeled Addendum A and there after become part of this agreement." In paragraphs (4), (5), (6) and (7) Perkins agrees to be solely responsible for supervising, maintaining, and insuring the equipment." The equipment is referred to as "its [Perkins'] **property** installed on the property owned by the AUTHORITY." In paragraph (4) the equipment is "all of the equipment installed and **owned** by [Perkins] pursuant to the terms of this Contract." (emphasis added).

5

prospective bidders, or to impose the cost of that equipment on those bidders. Under SHA's interpretation, Perkins might find itself with no willing buyer or reimbursement for the equipment, and could theoretically chose to remove the equipment or even, abandon it on site. Perkins asserts the express language of Paragraph (3) obligates SHA, if not exercising its own option to buy the equipment, and if putting the contract out to bid, to provide the cost of Perkins' equipment to prospective bidders, who would include the cost to their bids. Under Perkins' interpretation, SHA would either pay Perkins for the equipment directly by buying it, or pay indirectly, as part of its payment to the successful bidder.

When a contract is unambiguous, its interpretation "must be determined from the plain meaning of the language used and from the four corners of the instrument without resort to extrinsic evidence." American Protection Insurance Co. v. Acadia Insurance Co., 2003 ME 6, ¶ 11, 814 A.2d 989, 993 (citation omitted). An unambiguous contract is construed "in accordance with the intention of the parties, which is to be ascertained from an examination of the whole instrument. All parts and clauses must be considered together that it may be seen if and how one clause is explained, modified or controlled by the others." Id. (citation omitted). Furthermore, a contract should be construed in a way that gives "force and effect to all its provisions and not in a way that renders any of its provisions meaningless." Id. at ¶ 12 (citations omitted).

Determining whether contract language is ambiguous is a question of law. "Contract language is ambiguous when it is reasonably susceptible of different interpretations." Id. (quoting Portland Valve Inc. v. Rockwood Sys. Corp., 460 A.2d 1383, 1387 (Me. 1983)). Interpretation of an unambiguous contract is a question of law. Id. (citing Acadia Ins. Co. v. Buck, 2000 ME 154, ¶ 8, 756 A.2d 515, 517). However, interpretation of an ambiguous contract is a question of fact, for the fact finder. Id.

6

(citing Acadia Ins. Co., 2000 ME 154, ¶ 8, 756 A.2d at 517). If terms of a contract are found by the court to be ambiguous, parole evidence may be introduced to show what was in the minds of the parties at the time of making the contract.

Thus the first task before this court is to decide whether the language of Paragraph (3) is ambiguous, that is, susceptible to two different and reasonable interpretations, keeping in mind that the mere fact the parties disagree as to the meaning of contract language, "does not necessitate a conclusion that the language is ambiguous."[3]

The first sentence of Paragraph (3) clearly states that SHA has an option to purchase the Perkins equipment if it so chooses, and that Perkins would be obliged to sell the equipment under mutually agreed upon terms if SHA exercised that option. The second sentence describes rights in the equipment in the event SHA puts the propane contract up for bid. Perkins is obligated ("will") to supply a price for its equipment "so that any prospective bidder can include in its bid the cost of purchasing this equipment from PERKINS PROPANE."

This second sentence is clearly intended to govern disposition of Perkins existing equipment on SHA property in the event SHA does not opt to buy it and the contract passes to a new supplier. What is not clear is whether SHA must or may supply the price to bidders and whether "any prospective bidder" must include the cost or may include the cost of Perkins equipment in its bid.

Perkins' interpretation, that SHA must supply, and bidders must include the cost is reasonable, given the new circumstances contemplated in the second sentence (putting the contract up for bid) and new requirement "so that any bidder can include

---

[3] Corbin on Contracts, § 24.7 (Rev. ed. 1998). (quoting Stephan v. Penn. Gen. Ins. Co., 621 A.2d 258 (Ct. 1993)).

7

the cost in its bid" which suggests that including the cost is understood to be part of that circumstance. It would be reasonable for the SHA, in ensuring an uninterrupted supply of propane to the apartments, to anticipate that a new supplier would make use of the previous supplier's equipment at least until the new supplier installed its own equipment under the contract's specifications. It would also be reasonable for Perkins to expect reimbursement for equipment affixed to SHA's property, created to SHA's specifications or tailored to the site. Likewise, SHA's interpretation, that communicating and passing on the cost of the equipment was optional, is also reasonable, given that SHA's option to buy in the first sentence, could be seen to extend to the prospective bidders, in the second sentence. SHA may have intended to keep itself and its prospective suppliers free from the risk of paying for outdated, worn, or unsafe equipment installed by previous suppliers. SHA's insistence on Perkins' ownership of and responsibility for its equipment elsewhere in the contract would suggest this is not an unreasonable interpretation.

Here, the parties differing interpretations of Paragraph (3) are reasonable and rest on their competing views of the parties' intentions and expectations, rendering the language of Paragraph (3) ambiguous.[4] Because there is a disputed issue of material fact as to the parties' intentions and expectations under the terms of their contract, summary judgment is precluded.

Thus, the Motion for Summary Judgment is Denied.

Dated: September 14, 2004

G. Arthur Brennan
Justice, Superior Court

---

[4] See, e.g., Benton Falls Assc. v. Central Maine Power, 2003 ME 99, 828 A.2d 759, denying summary judgment when the parties' two reasonable interpretations of rate provision language in a contract rendered the contract ambiguous, and created a genuine factual issue as to the parties' intentions.

Thomas G. Van Houten, Esq. - PL
Guy D. Loranger, Esq. - DEF

8