STATE OF MAINE                          BUSINESS AND CONSUMER COURT
CUMBERLAND, ss                          CIVIL ACTION
                                        DOCKET NO. BCD-CV-18-41          ✓

MARK LEVESQUE, CHRISTIE DECKER,
LISA McLEOD, and MICHAEL PLATT,

         Plaintiffs

v.                                      **ORDER ON PENDING
                                        MOTIONS**

CENTRAL MAINE POWER COMPANY
and AVANGRID, INC.,

         Defendants


Before the Court are defendant Central Maine Power's ("CMP's") and Avangrid, Inc.'s

Motion to Dismiss and plaintiff Mark Levesque's[1] Motion for a Temporary Restraining Order

as well as a Preliminary and Permanent Injunction. In their motion, CMP and Avangrid are

seeking dismissal pursuant to both the doctrine of primary jurisdiction as well as Plaintiffs'

failure to state a claim upon which relief may be granted. M.R. Civ. P. 9(b), 12(b)(6). In his

motion, Mark Levesque seeks an order enjoining Defendants from sending disconnect notices

and from disconnecting Plaintiffs and the putative class members' electricity.[2]

**Background**

There are four named Plaintiffs in this case: Mark Levesque, Christie Decker, Lisa

McLeod, and Michael Platt. No plaintiff class has been certified. *See* M.R. Civ. P. 23.

Defendants are CMP and Avangrid, Inc.[3] The following facts are alleged in Plaintiffs'

---

[1] Although there are four named Plaintiffs, the motion for TRO has been brought in Mark Levesque's name only.
[2] At oral argument, Plaintiffs modified the request for relief by limiting their request to an injunction on disconnections during the winter disconnection period only.
[3] Throughout their complaint, Plaintiffs refer to CMP and Avangrid collectively as CMP. Plaintiffs do not explain the relationship between CMP and Avangrid and only one factual allegation pertains specifically to Avangrid alone. (*See* Compl. ¶¶ 1, 4.)

1

Amended Complaint.

On October 30, 2017, CMP switched its computer billing system. (Compl. ¶ 2.) As a result, and also due in part to metering issues, approximately 97,000 CMP customers saw their bills increase by 50% or more. (Compl. ¶ 2.) An additional 200,000 CMP customers saw their bills increase up to 50%. (Compl. ¶ 3.) CMP knew that its billing system was inaccurate and that its meters were malfunctioning. (Compl. ¶ 3.) Despite this knowledge, CMP did little to address the problems and did not reimburse customers' money that CMP had improperly collected. (Compl. ¶ 3.) CMP intentionally told customers and the public that the billing system and meters were not the cause of the high bills. (Compl. ¶ 3.) Avangrid was aware of customer complaints that were reported in the media and knowingly continued to have CMP employ the meters. (Compl. ¶ 4.)

After CMP switched its billing software, plaintiff Levesque received bills that were $100 to $200 higher than usual. (Compl. ¶ 14.) Levesque knew CMP was overcharging him because of the sudden and drastic increase in the amount of his bills and the recorded kilowatt hours and because his family had removed their hot tub, switched to LED Lights, and had two children leave the home. (Compl. ¶ 15.) CMP told Levesque that the increased bills were the fault of him and his family because of their increased use of heat and their use of faulty and old appliances. (Compl. ¶ 16.)

After the switch, Christie Decker similarly received bills that were substantially higher than normal. (Compl. ¶ 17.) In March 2018, Decker's meter was tested and fixed. (Compl. ¶ 17.) Subsequently, Decker's bill dropped back to its normal range. (Compl. ¶ 17.) On February 28, 2018, Decker received a disconnection notice from CMP. (Compl. ¶ 18.) CMP also

2

informed Decker that her bill was accurate. (Compl. ¶ 18.) CMP then attempted to disconnect Decker's electricity without satisfying the required prerequisites for disconnection during that time of the year. (Compl. ¶ 18.) Decker attempted to pay her bills after the disconnection notices and attempts. (Compl. ¶ 18.)

After the switch, Lisa McLeod's electricity usage increased by approximately one-third. (Compl. ¶ 19.) After contacting CMP, McLeod was told the issue was the wiring in her house. (Compl. ¶ 19.) In April 2017,[4] McLeod received a bill for non-existent meters. (Compl. ¶ 19.) On February 28, 2018, McLeod received a disconnection notice from CMP. (Compl. ¶ 20.) CMP also attempted to disconnect McLeod's electricity without satisfying the necessary prerequisites. (Compl. ¶ 20.) McLeod attempted to pay her bill after the disconnection notice and attempt. (Compl. ¶ 20.)

Michael Platt has also seen his bills increase. (Compl. ¶ 21.) Platt has not received any disconnection notice.[5] (Compl. ¶ 21.)

Plaintiffs' Amended Complaint alleges four causes of action: Count I, Unjust Enrichment; Count II, Breach of Contract; Count III, Private Cause of Action—35-A M.R.S § 1501; Count IV, Fraudulent and Intentional Misrepresentation and Punitive Damages.

## Discussion

### Motion to Dismiss

In their motion, Defendants seek dismissal on two grounds. First, Defendants argue that the case should be dismissed pursuant to the doctrine of primary jurisdiction. Second,

---

[4] April 2017 is the date alleged in Plaintiffs' complaint. The court notes that this date occurred prior to CMP's October 30, 2017 change in its billing system.

[5] These are the only allegations pertaining to Michael Platt in the complaint.

Defendants argue that all counts against Avangrid and counts I and IV against CMP should be dismissed for failure to state a claim upon which relief may be granted.

A motion to dismiss brought pursuant to the doctrine of primary jurisdiction is not a challenge to the court's jurisdiction over the parties or the subject matter of the case. *See Savage et al. v. Central Me. Power Co.*, No. BCD-CV-2017-61, Me. Bus. & Consumer LEXIS 29 at *7 (Me. Bus. & Consumer Ct. June 15, 2018). Instead, such a motion seeks to determine whether the court should refrain from exercising its jurisdiction over the parties. *Town of Levant v. Seymour*, 2004 ME 115, ¶ 14, 855 A.2d 1159. The doctrine is a judicial policy wherein a court "will generally not decide an issue concerning which an administrative agency has decision capacity until after the agency has considered the issue." *State ex rel. Brennan v. R. D. Realty Corp.*, 349 A.2d 201, 207 (Me. 1975). Although they are distinct concepts, primary jurisdiction is similar to the exhaustion of administrative remedies in that "[e]ach [doctrine] rests on the premise that an agency has the primary authority to make certain decision deemed relevant to the determination of the controversy." *State ex rel. Brennan v. R. D. Realty Corp.*, 349 A.2d 201, 206 (Me. 1975) (citing *Pub. Utils. Comm'n of Cal v. United States*, 355 U.S. 534 (1958)). A court's decision to exercise its concurrent jurisdiction is reviewed for an abuse of discretion. *See Town of Levant*, 2004 ME 115, ¶ 17, 855 A.2d 1159.

Courts consider a number of factors when determining the applicability of the primary jurisdiction doctrine. These factors include: "(1) [whether] the question at issue is within the conventional experience of judges, (2) [whether] the issue lies in the agency's discretion or is within the agency's particular expertise, (3) whether there exists a danger of inconsistent rulings, and (4) whether a prior application to the agency has been made. *In re Megan-Racine*

4

*Assocs., Inc.*, 180 B.R. 375, 381 (Bankr. N.D. N.Y. 1995).[6]

In this case, CMP urges the court to dismiss this action and permit the Public Utilities Commission (the "PUC") to consider the parties' underlying dispute. CMP argues that the issues raised by the complaint are within the expertise of the PUC, that the PUC has the authority to order CMP to reimburse Plaintiffs, that the PUC's expert findings will be relevant to these proceedings, and that Plaintiffs will not be prejudiced by waiting for the PUC to finish its investigation.

The Plaintiffs argue that their claims for unjust enrichment, breach of contract, private statutory action, and fraud are the types of claims that are within the "conventional competence" of courts and are not the types of claims the PUC deals with. *See Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 305-06 (1976). Further, Plaintiffs aver that the issues raised by the complaint are not technical issues. Plaintiffs also argue that the court should exercise jurisdiction because the PUC is unable to award punitive damages, because the PUC is unable to maintain the status quo, and because the allegations in the complaint are presumed to be true at this stage of proceedings.

The legislative function of regulating and controlling public utilities has been delegated, in its entirety, to the PUC. *Mechanic Falls Water Co. v. Pub. Utils. Comm'n*, 381 A.2d 1080, 1090 (Me. 1977). To this end, the legislature has tasked the PUC with ensuring "safe, reasonable and adequate [utility] service." The PUC has specific authority to resolve utility billing disputes and may order reparation or adjustment when it finds that there has been an overcharge. 35-A M.R.S. § 1308. The PUC has promulgated rules governing such billing

---

[6] The Law Court has favorably cited this case for its discussion of the factors relevant to making a determination regarding primary jurisdiction. *See Benton Falls Assocs. v. Cent. Me. Power Co.*, 2003 ME 99, ¶ 15, 828 A.2d 759.

disputes. 65-407 C.M.R ch. 815, § 13. Additionally, the PUC has authority to investigate regulated utilities. 35-A M.R.S. § 1308.

Although Plaintiffs' breach of contract, unjust enrichment, and fraud claims are undoubtedly within the experience of judges, the gravamen of Plaintiffs' complaint is squarely focused on what amounts to a billing dispute between CMP and its customers. Moreover, the PUC has already initiated an investigation into the billing practices which form the core of the parties' dispute.[7] (Motion to Dismiss Ex. 2.) At this investigation, Plaintiffs, as well as other CMP customers and the Office of the Public Advocate, will have the opportunity to engage in an adversarial proceeding and "aggressively litigate the metering and billing issues."[8] (January 15, 2019 Notice of New Developments Ex. A. at 8.)

Given that the PUC has exclusive authority to regulate public utilities and that an investigation into CMP's billing practices and customer response is currently ongoing, prudence would suggest that this court defer to the PUC's authority and refrain from proceeding in this matter until the PUC's investigation is complete. *See Town of Levant*, 2004 ME 115, ¶ 14, 855 A.2d 1159. Further, the PUC's investigation encompasses billing irregularities for an incredibly large number of CMP customers and is therefore an issue not only of great public importance but also of public policy. Because of this, the court also believes that it should defer to the PUC in order to allow the participation of all interested

[7] At the time of the parties' initial briefing, the PUC had undertaken a "summary investigation." Since then, the PUC has initiated a "Formal Investigation." (January 15, 2019 Notice of New Developments Ex. A.) The scope of the PUC's investigation concerns, among other things, such issues as the accuracy of CMP's electric meters; the accuracy of CMP's bills; the ability of CMP to identify billing errors; the propriety of CMP's response to any identified errors; and the quality of CMP's customer response. (Motion to Dismiss Ex. 2.)

[8] On February 5, 2019, the PUC granted Plaintiffs' request to intervene in the PUC's Formal Investigation. *Investigation of Central Maine Power Company's Metering and Billing Issues*, No. 2019-00015, Procedural Order (Me. P.U.C. February 5, 2019).

6

stakeholders, not least among them the Office of the Public Advocate, and to allow the expert body charged with the legislative function of setting Maine's utility policy to decide the disputed issues without judicial interference. *See State ex rel. Brennan*, 349 A.2d at 207-08.

Finally, by deferring to the PUC's investigative authority, the court will also avoid the substantial risk of issuing competing and inconsistent orders. For instance, in their motion for a preliminary injunction, Plaintiffs request that the court enjoin CMP from issuing disconnect notices to or disconnecting the electricity of Plaintiffs and the putative class members. Plaintiffs base this request on the allegedly faulty electric meters and CMP's failure to obtain accurate meter readings. (Pl's Mot. TRO at 15-17.) The PUC, however, has already addressed this issue in its April 11, 2018 Order wherein the PUC ordered CMP to refrain from sending disconnect notices or from disconnecting the power of customers who meet certain eligibility criteria.[9] (Motion to Dismiss Ex. 11.) In that order, the PUC adopted what it termed a "balanced approach" and expressly denied the Office of the Public Advocate's request that the PUC order CMP to refrain from all disconnections until the resolution of this billing dispute. (Motion to Dismiss Ex. 11 at 3.)

Given that Plaintiffs' have already requested that this court issue an order which conflicts with an order of the PUC, it is not unreasonable to believe that a threat of inconsistent

---

[9] As relevant to this case, the Order defines an "eligible customer" as:

> [A]ny residential customer who has received or will receive a bill issued on or after November 1, 2017 that reflects total CMP delivery charges that are 25% or more than delivery charges for which the customer was billed for the same month in the prior year and the customer has disputed the increase (Criteria One).

(Motion to Dismiss Ex. 11.) The Order also has a second criteria (Criteria Two) for determining whether a customer who was not receiving service 12 months prior to the month at issue is an "eligible customer."

rulings exists. Further, the regulation of public utilities is a fundamentally legislative, not judicial, function. *Mechanic Falls Water Co.*, 381 A.2d at 1090. Accordingly, an inconsistent ruling from this court would also risk undermining the Legislature's exclusive delegation of regulatory control to the PUC, *see id*, and would consequently interfere with the PUC's efforts to ensure that utility service remains safe, reasonable and adequate and is provided at a minimal cost to Maine Consumers. *See* 35-A M.R.S. § 101; *Bar Harbor Banking & Trust Co. v. Alexander*, 411 A.2d 74, 78 (Me. 1980) (the doctrine of primary jurisdiction forbids judicial action which would directly interfere with an agency's performance of its statutory duties).

Accordingly, this court exercises its discretion and concludes that under the principles of primary jurisdiction, this case should be stayed, but not dismissed until the resolution of the PUC's formal investigation in CMP's billing practices. *See Bar Harbor Banking & Trust Co.*, 411 A.2d at 78 (stating that in accordance with the doctrine of primary jurisdiction, "the declaratory judgment action in the Superior Court must be stayed pending completion of the administrative process."). The Court concludes that a stay, rather than a dismissal, is appropriate due to the fact that the PUC's investigative process may produce facts relevant to both parties' arguments on the merits of Defendants' Rule 12(b)(6) motion to dismiss as well as any future equitable relief sought by Plaintiffs. For the same reason, the court will refrain from ruling on Defendants' Rule 12(b)(6) motion. Given that the estimated timeline for completion of the PUC's investigation is less than a year, this matter will be stayed until November 1, 2019 and a telephonic status conference shall be scheduled for October 2019.

## Motion for Injunctive Relief

In order to obtain a temporary restraining order or a preliminary injunction, the party

8

seeking the order bears the burden of demonstrating (1) that it will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting the injunctive relief would inflict on the other party; (3) that it has a likelihood of success on the merits; and (4) that the public interest will not be adversely affected if an injunction is granted. *Ingraham v. University of Maine*, 441 A.2d 691, 692-93 (Me 1982). A failure to make the required showing for any one of these elements will result in denial of injunctive relief. *Bangor Historic Track, Inc. v. Dep't of Agric., Food & Rural Res.*, 2003 ME 140, ¶ 10, 837 A.2d 129. Additionally, in order to obtain a TRO, the moving party must demonstrate that the complained of injury will immediately occur if the TRO is not granted. *Stanley v. Town of Greene*, 2015 ME 69, 13, 117 A.3d 600; M.R. Civ. P. 65(a).

In this case, Plaintiffs argue that the disconnection notices and threats constitute irreparable injury because money damages will not adequately compensate them for the harm that these notices and threats cause. Specifically, Plaintiffs argue that these threats leave them with the choice of either: (1) paying excessive, inaccurate, and unaffordable bills; or (2) risking disconnection by challenging the accuracy of those bills. Plaintiffs also argue that their fear of being taken advantage of, deprived of their rights, blamed for the erroneous bills and of suffering potential reputational consequences constitutes irreparable harm.

In support of their motion, Plaintiffs have submitted one affidavit from a named plaintiff, Mark Levesque, and six affidavits from CMP customers who purport to be putative class members.[10] In their opposition, Defendants argue that, because no class of unnamed Plaintiffs has been certified, the court should only consider the issues and evidence as it relates

---

[10] These are affiants are: Brittney Russell; Marc and Jen Day; Julia Lawson; Carol Foss; Nicole and Phillip Riley; and Katie Morin.

to the one named plaintiff bringing this motion. Regardless of the propriety of considering the six non-party affidavits filed in support of their motion, Plaintiffs' request for injunctive relief must be denied because they have not shown that a denial of their request will result in irreparable harm to any named plaintiff or putative class member.

The critical factor weighing against a finding of irreparable harm is that denial of this motion would not foreclose Plaintiffs from preventing disconnection if they challenged the accuracy of their bills. As discussed above, the PUC is required to establish a system of resolving billing disputes. To this end, the PUC has promulgated rules governing a utility's conduct during billing disputes. 65-407 C.M.R ch. 815, § 13. These rules expressly state that "[a] utility may not threaten disconnection or disconnect the service of a customer if the customer has informed the utility that the customer disputes liability for the bill." This prohibition lasts until the dispute is resolved pursuant to the process established by PUC rules. *Id.* § 13(C). Further, utility customers are also able to file consumer complaints with the PUC's Consumer Assistance Division ("CAD"). Disconnections and threats of disconnections are prohibited during the pendency of CAD investigation into billing disputes. *Id.* § 13(G)(1). If a customer's utility service has already been disconnected, the CAD may also order that service be restored pending resolution of the complaint. *Id.* § 13(G)(2).

Although the Plaintiffs have presented considerable evidence that CMP may be inadequately responding to customer complaints, failing to provide customers with information required by PUC rules, and failing to adhere to the procedures required for disconnection, the Plaintiffs have not demonstrated that they are unable to pursue the administrative remedies available to them through the PUC and that injunctive relief is the

10

only method of avoiding harm.[11] Accordingly, because an available procedure exists through which the Plaintiffs may avoid the harm caused by the disconnection notices, it does not appear that any irreparable injury will *immediately* result from a denial of Plaintiffs' motion for injunctive relief. *See Bar Harbor Banking & Trust Co.*, 411 A.2d at 79 (stating that "[a]ny inconvenience, expense or reputational injury [which] results from holding a statutorily authorized administrative hearing does not constitute irreparable harm"); *Gately v. Massachusetts*, 2 F.3d 1221, 1232 (1st Cir. 1993) (stating that "irreparable harm is subject to a sliding scale analysis, such that the showing of irreparable harm required of a plaintiff increases in the presence of factors, including the failure to exhaust administrative remedies, which cut against a court's traditional authority to issue equitable relief.").

Because it does not appear that Plaintiffs will suffer any immediate irreparable injury, their motion for a TRO will be denied. M.R. Civ. P. 65(a); *Bangor Historic Track, Inc.*, 2003 ME 140, ¶ 10, 837 A.2d 129. However, in light of this court's stay of proceedings, and due to the fact that evidence could emerge during the course of the PUC's investigation which show that it is necessary for the court to intervene in order to maintain the status quo, the court will refrain from deciding Plaintiffs' motion for preliminary and permanent injunctive relief.

---

[11] Moreover, Plaintiffs have also now intervened in the PUC's investigation and CMP has placed an "infinity lock" on Plaintiffs' CMP accounts. This infinity lock will prevent any disconnections or disconnection notices from issuing until the resolution of the Plaintiffs' dispute with CMP.

The entry is:

Plaintiffs' Motion for a Temporary Restraining Order is DENIED

Proceedings in This Case are Stayed Until November 1, 2019.

This order is to be incorporated on the docket for this case by reference.

Date: 2/22/19

M. Michaela Murphy
Justice, Superior Court

Entered on the Docket: 2/25/19
Copies sent via Mail___ Electronically ✓

12