2003 ME 6

**AMERICAN PROTECTION INSURANCE CO.**

v.

**ACADIA INSURANCE CO.**

Supreme Judicial Court of Maine.

Argued: Nov. 13, 2002.
Decided: Jan. 15, 2003.

Robert J. Piampiano, Esq. (orally), Troubh, Heisler & Piampiano, P.A., Portland, for plaintiff.

James C. Hunt, Esq. (orally), Robinson Kriger & McCallum, Portland, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

CLIFFORD, J.

[¶ 1] American Protection Insurance Company, a Kemper Insurance Company (Kemper), appeals from a summary judgment entered in the Superior Court (Cumberland County, *Crowley, J.*). Kemper contends that the court erred in its conclusion that the contract in dispute is unambiguous and that Acadia is entitled to judgment. Kemper argues that the contract is unambiguous in its favor or, in the alternative, that if the contract is ambiguous, then the undisputed extrinsic evidence resolves the ambiguity in its favor. Finding no error, we affirm the Superior Court's judgment.

## I.

[¶ 2] In 1998, the Bureau of General Services (BGS) and the Department of Corrections began planning to construct the Northern Maine Juvenile Facility in Charleston (Project). BGS and the Department requested that the Division of Risk Management, a division of BGS responsible for insurance matters, set up an Owner–Controlled Insurance Program (OCIP) for the Project.[1] The Department and BGS contracted with Granger Northern to be the general contractor for construction of the new facility. The provisions of the OCIP, described in the Contractor's Insurance Requirements, became part of the contract signed with Granger Northern. Granger Northern entered into a subcontract agreement with Accidental Anomalies pursuant to which Accidental Anomalies agreed to furnish structural steel to the Project and furnish and install metal fabrications at the Project. The Contractor's Insurance Requirements were also incorporated into the contract between Granger Northern and Accidental Anomalies. Reliance Insurance Company originally provided the workers' compensation insurance for OCIP covered work. Acadia provided workers' compensation coverage for Accidental Anomalies for work *not* covered by the OCIP.

[¶ 3] Subsection 1.1 of the Contractor's Insurance Requirements provides that the OCIP insurance "covers the Owner, Contractor and Subcontractor of all tiers, *but not excluded entities as defined herein.*" (Emphasis added.) Subsection 2.3 defines "excluded entities" to mean "vendors, suppliers, fabricators, material dealers, drivers and others *who merely transport, pick up, deliver or carry materials, personnel, parts or equipment or any other items or persons to or from the Project site* who are excluded from the OCIP."[2] (Emphasis added.)

[¶ 4] Subsection 1.1 provides that "[e]ven if Contractor and Subcontractors are insured in an O.C.I.P., they must purchase the insurance in Subsection 3.8." Subsection 3.8 is entitled "Contractor–Provided Insurance Necessary for the work, but Outside the O.C.I.P." Subsection 3.8.6 describes the type and amount of workers' compensation coverage that subcontractors must have to cover "operations **away from the Project site** of the Contractor or Subcontractor." (Emphasis in original.) In contrast, subsection 2.3 states that those who qualify as excluded entities under subsection 2.3 must provide insurance required by subsection 3.9. Subsection 3.9.1 describes the type and amount of workers' compensation coverage required to cover "work at the Project site."

[¶ 5] Subsection 3.1 lists the kinds of insurance provided by the Owner, in this case the State, when the Owner awards a

---

1. The State uses OCIPs to save costs, secure better coverage, and have better safety programs. If a construction project does not have an OCIP, then each contractor and subcontractor has to procure its own insurance and the higher cost of the insurance is passed on to the State. If a project does have an OCIP, then the State decides what coverage and coverage limits are necessary, arranges for that insurance, and pays the premiums. The cost of the insurance is deducted from the contract price paid to each contractor or subcontractor.

2. Similarly, subsection 2.1 provides that:

   Vendors, suppliers, fabricators, material dealers, drivers and others *who merely transport, pick up, deliver or carry materials, personnel, parts or equipment or any other items to or from the Project site shall not be considered Contractors or Subcontractors of any tier for the purpose of insurance coverage.*

   (Emphasis added.)

contract and provides an OCIP. Subsection 3.2 describes the workers' compensation coverage provided by the Owner and states that such insurance "will *cover operations of* the Owner, Contractor and *Subcontractors of all tiers performed ·in connection with the work at the Project site. This insurance is primary ·for all occurrences at the Project site.*" (Emphasis added.)

[¶ 6] The subcontract agreement between Granger Northern and Accidental Anomalies also includes Exhibit C, which defines the scope of work that Accidental Anomalies would be responsible for on the Project. According to Exhibit C, Accidental Anomalies was to do the following: "Furnish, F.O.B. jobsite, all Structural Steel complete and without exception" and "*[f]urnish and fully install all Metal Fabrications complete and without exception.*" (Emphasis added.)

[¶ 7] On August 25, 2000, Wayne Gurschick, an employee of Accidental Anomalies, was injured while unloading steel columns at the Project. At the time the accident occurred, Gurschick was delivering and unloading steel that was to be used by another subcontractor. Gurschick had intended to perform field verification work to aid in Accidental Anomalies' onsite installation after delivering the steel, but was injured before he could do so. The injuries Gurschick incurred in the accident required medical services, including surgery, and he had to miss time from work. Because the injury occurred during the course of his employment with Accidental Anomalies, he was entitled to collect workers' compensation.

[¶ 8] By the summer of 2000, Reliance was in financial difficulties, so Reliance,

Kemper, and the Department entered into a Novation Agreement on September 5, 2000, pursuant to which Kemper agreed to assume all of Reliance's rights and obligations under the policies regarding the Project. Despite the Novation Agreement, Reliance began to pay workers' compensation benefits to Gurschick on November 16, 2000. As of March 2002, Gurschick had received workers' compensation benefits of $3008.19 for wage replacement and $45,035.75 for his medical expenses. These benefits were originally paid by Reliance; the payments were then assumed by Kemper. Gurschick has continuing medical expenses and permanent restrictions caused by his injury, and he will likely be entitled to future workers' compensation benefits.[3]

[¶ 9] In July of 2001, Kemper filed a complaint for declaratory judgment and damages requesting that the court find Acadia responsible for the workers' compensation payments to Gurschick. Both parties moved for summary judgment. Entering a summary judgment for Acadia, the court found that the language of the Subcontract Agreement between Granger Northern and Accidental Anomalies, and the Contractors' Insurance Requirements under the OCIP to be unambiguous. Citing language from subsections 2.1 and 2.3, the court found that "a subcontractor is at all times a covered entity under the O.C.I.P. unless that subcontractor is an 'excluded entity.'" Since Accidental Anomalies was responsible for installing metal fabrications on the jobsite, it was not an excluded entity. Accordingly, the court concluded that under the unambiguous language of the contract, Kemper was responsible for Gurschick's workers' compensation bene-

---

**3.** Although for the month of August of 2000, Accidental Anomalies reported zero payroll for the OCIP program, the policies issued by Reliance and Kemper are subject to a final audit after the work is done. Kemper may have been entitled to an additional premium if a greater amount of payroll is allocated to work at the Project.

fits for the accident that occurred on the Project jobsite.

## II.

[¶ 10] We review a grant of summary judgment "for errors of law, viewing the evidence in the light most favorable to the non-moving party." *Acadia Ins. Co. v. Buck Constr. Co.,* 2000 ME 154, ¶ 7, 756 A.2d 515, 517. Granting a motion for summary judgment "is proper when the citations to the record found in the parties Rule 7(d) [now Rule 56(h)] statements demonstrate that no genuine issue of material fact has been generated and that a party is entitled to a judgment as a matter of law." *Id.* An issue is considered genuine "if there is sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." *Prescott v. State Tax Assessor,* 1998 ME 250, ¶ 5, 721 A.2d 169, 171–72 (inner citation omitted). A fact is considered to be material if it could potentially affect the outcome of the case. *Id.* ¶ 5, 721 A.2d at 172.

[¶ 11] Determining whether or not a contract is ambiguous is a question of law, which we review *de novo. Apgar v. Commercial Union Ins. Co.,* 683 A.2d 497, 498 (Me.1996). "Contract language is ambiguous when it is reasonably susceptible of different interpretations." *Portland Valve Inc. v. Rockwood Sys. Corp.,* 460 A.2d 1383, 1387 (Me.1983). If we determine that the contract is unambiguous, then its interpretation is also a question of law. *Buck,* 2000 ME 154, ¶ 8, 756 A.2d at 517. On the other hand, if the contract is ambiguous, then "its interpretation is a question of fact for the factfinder." *Id.* The interpretation of an unambiguous contract "must be determined from the plain meaning of the language used and from the four corners of the instrument without resort to extrinsic evidence." *Portland*

*Valve, Inc.,* 460 A.2d at 1387. Furthermore, there is a long-standing rule in Maine, which provides that:

> A contract of insurance, like any other contract, is to be construed in accordance with the intention of the parties, which is to be ascertained from an examination of the whole instrument. All parts and clauses must be considered together that it may be seen if and how one clause is explained, modified, limited or controlled by the others.

*Peerless Ins. Co. v. Brennon,* 564 A.2d 383, 384–85 (Me.1989) (quoting *Swift v. Patrons' Androscoggin Mut. Fire Ins. Co.,* 125 Me. 255, 132 A. 745, 746 (1926)).

[¶ 12] Accordingly, when interpreting a contract, a court needs to look at the whole instrument. *Peerless Ins. Co.,* 564 A.2d at 384–85. Furthermore, a contract should "be construed to give force and effect to all of its provisions" and not in a way that renders any of its provisions meaningless. *Buck,* 2000 ME 154, ¶ 9, 756 A.2d at 517. In this case, the Contractor's Insurance Requirements were incorporated into the subcontract agreement between the general contractor, Granger Northern, and the subcontractor, Accidental Anomalies. We consider the whole agreement, and not, as Kemper suggests, merely the insurance requirements section. The entire contract includes Exhibit C, which defines the scope of work that Accidental Anomalies is responsible for completing.

[¶ 13] Language in a contract should be given its plain meaning. *Portland Valve, Inc.,* 460 A.2d at 1387. Kemper argues that whether or not an accident is covered under the OCIP is determined by the activity being performed at the exact time of the accident, and since Gurschick was *delivering* at the time of his accident and not *installing,* his injuries are

not covered by the OCIP. Kemper contends that subsection 2.3 lists types of *work* that are excluded, not types of *entities*. This interpretation is contrary to the very title of subsection 2.3, which is "excluded *entities*." (Emphasis added.) Accidental Anomalies does not fall within the definition of an "excluded entity." Rather, Accidental Anomalies is a "subcontractor" under the OCIP. Exhibit C of the contract defines the scope of work that Accidental Anomalies is responsible for on the Project, which includes furnishing structural steel to the jobsite and *installing* metal fabrications. Also, Exhibit C provides that Accidental Anomalies must complete the forms necessary to enroll in the OCIP "prior to commencement on-site." Excluded entities are not covered by the OCIP and are required under subsection 3.9 to get their own insurance coverage for work at the jobsite. Accordingly, it would be contrary to the plain meaning of the subcontract agreement to require Accidental Anomalies to enroll in the OCIP if it is excluded from the OCIP. Furthermore, given the scope of Accidental Anomalies' work at the site, it is not an excluded entity in subsection 2.3.

[¶ 14] The plain meaning of the document, when read as a whole, is that subcontractors *covered* under the OCIP are covered for work done at the Project site, but they must have their own insurance to cover accidents that occur away from the Project site. In contrast, those entities that are *excluded* from the OCIP must procure their own insurance to cover all accidents, even those occurring at the Project site. The numerous provisions of the contract, when read together, make such a conclusion clear. For example, subsection 3.2.1 describes the workers' compensation insurance provided by the OCIP as cover-

ing work "at the Project site," and subsection 3.1, in describing the insurance provided by the Owner (i.e. the State), states that subsection 3.2 insurance covers only work "performed at the Project site," and that no insurance provided by the owner will cover work performed "at permanent yards or other locations of any contractor or subcontractor." Furthermore, according to subsection 1.1, contractors and subcontractors within the OCIP are still required to have the insurance required in subsection 3.8, which covers work outside the OCIP, including workers' compensation as described in subsection 3.8.6 that covers work performed **"away from the Project site** of the Contractor or Subcontractor." (Emphasis in original.)

[¶ 15] The Superior Court correctly entered a summary judgment in favor of Acadia. Properly construed, the documents provide that subcontractors who are not excluded entities are covered under the OCIP for work performed at the Project site, but not covered for work performed away from the Project site.[4] Gurschick, employed by Accidental Anomalies, a nonexcluded entity subcontractor, was injured at the Project site during the scope of his employment. Accordingly, Acadia was entitled to summary judgment because under unambiguous provisions of the contract Kemper was responsible for payments under the OCIP.

The entry is:

Judgment affirmed.

<hr>

4. The expansive language used by the court, which could be read to mean that subcontrac-

tors are covered even when not at the job site, is dicta that we need not address.