STATE OF MAINE

LINCOLN, ss.

MARTIN E. MOORE and
COASTAL DESIGNERS
AND CONSULTANTS, INC.,

Plaintiffs

v.

OCTOBER CORPORATION and
BOULOS PROPERTY MANAGEMENT,

Defendants

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-02-045

LINCOLN RECEIVED AND FILED
LINCOLN COUNTY SUPERIOR COURT
OCT 01 2004
SHARON SIMPSON
CLERK

**DECISION AND ORDER**

OCT 20 2004

## I.    Introduction.

Pending before the court is the defendants' motion for partial summary judgment which seeks disposition in their favor on count I of the plaintiffs' second amended complaint.  For their part, the plaintiffs oppose this motion but assert that because the contract at issue is unambiguous and because the defendants breached its terms, summary judgment ought to be entered for the plaintiffs on this count.  Thus, each set of parties ask the court to resolve count I in its respective favor via the pending motion.[1]  By this decision and order, the court will endeavor to address these competing requests.

## II.    Facts.

Based on the parties' submissions in support of, or in opposition to, the pending motion, the following facts or disputes of fact, may be found in the record.

October Corporation (October) purchased the former Pineland Center from the State in 2000 and decided to develop a dairy farm there which would include a dairy

---

[1] Counts II and III which allege, respectively, Unjust Enrichment and Quantum Meruit, are not the subject of this motion and, therefore will survive this motion and, apparently, be in order for trial.

barn. It engaged Coastal Designers and Consultants ("CDC"), of whom plaintiff Martin E. Moore (Moore) is the principal, to design the dairy barn. On July 21, 2001, the defendants signed a contract, which is the subject of the dispute in this case, by which CDC was to provide the design services for the dairy barn.

The contract, entitled "Standard Proposal Agreement for Construction Drawings" ("Agreement") was drafted by CDC and contained the following list of services it would provide:

- Site visit – Master planning session
- On site review of revised preliminary master plan, floor plans & elevations
- On site review meeting of revised preliminary plans
- On site review first draft of construction drawings & specifications
- On site review proof set of construction dwgs & specifications
- On site deliver & review construction drawings & specifications for contractor bid
- Assistance in selection of all finishing materials
- Assistance in selection of suppliers
- Assistance in selection of contractors
- Consultation during construction via telephone, fax & Federal Express
- Contractor bid review meeting
- Pre construction meeting w/G.C.

The contract also included the following relevant text under its section entitled "Standard Policy":

- A design fee of 10% will be charged based on the project construction cost excluding landscaping/bldg. permits fees
  . . . .
- In the event that the Owners stop this project for any reason, the Owners will only be responsible for the percentage of the drawings & specifications completed to date when we received notice to stop the project.
- The design fee will be charged for all portions of the project excluding landscaping & building permit.

Finally, the contract contained the following language as the payment schedule for the services that CDC would provide October:

## PAYMENT SCHEDULE

| | | |
|---|---|---|
| #1. | Retainer at start o work | $ 7,500.00 |
| #2. | Progress payment due & appreciated at preliminary drawing review meeting [Preliminary site plan layout – floor plan & elevations] | $15,500.00 |
| #3. | Progress payment due & appreciated at first draft construction drawing review meeting | $45,000.00 |
| #4. | Progress payment due & appreciated at the proof set of construction dwg & specification review meeting | $40,000.00 |
| #5. | Payment due & appreciated when bid documents are delivered [Dwgs. & specifications] | $42,000.00 |
| #6. | Balance due [if any] balance of 10% design fee when contractor bid is obtained | $ Pending |
| #7. | Final payment due [if any] 10% design fee of change orders | $ Pending |

The numbers cited above total $150,000 through step #5 in the schedule, namely when bid documents are delivered to the owner. The parties dispute the significance of this figure. The defendants say it represents 10%, CDC's fee, of a pre-contract budget estimate of $1,500,000 which would allow CDC to be paid $150,000 if October did not complete the project. DSMF, ¶ 24. Moore disagrees with this interpretation, and asserts that his fee was to be 10% of the cost of construction, but agrees that the figure of $1.5 million came from a discussion with individuals from October or Boulos Property Management (Boulos) as to the possible scope of the project. PRSMF, ¶ 20. He also agrees that the Agreement "suggests that a $1.5 million dollar project would be the minimum project cost." Id. Moore also testified that when he filled out the payment schedule, he used the 10% figure to calculate the payment schedule and that that 10% was applied against a $1.5 million building figure which he had discussed with the defendants. DRSMF, ¶ 20.

Thereafter, CDC received payments #1 through #4 under the Agreement's payment schedule which totaled $108,000. It also received $23,692.50 for work outside the contract for the dairy processing plant.

On November 5, 2001, CDC provided the defendants with a set of design development drawings which the defendants characterize as "preliminary drawings," DSMF, ¶ 30, but which Moore refers to as "the first draft of construction drawings." PRSMF, ¶ 30. On this date, CDC submitted an invoice for progress payment #3 in the amount of $45,000. Apparently it was paid.

The defendants say they then wished to get a budget estimate of the cost of constructing the dairy barn as it was depicted on the November 5, 2001, plans so gave these "preliminary" plans to Pochebit, a construction company, to get this estimate for constructing the dairy barn. Pochebit responded in December of 2001 with an estimated budget price of over $2.8 million which was more than the defendants contemplated spending.

In reaching this figure, Michael White of Pochebit testified that he understood his firm's task was to "get a preliminary budget estimate for the project;" that it was "real preliminary . . . a high and a low type of estimate . . . it was a range."" DSMF, ¶ 43.

The defendants further say that, based upon the costs given to them by Pochebit, they decided to look at various options, including "value engineering" for the dairy barn, to see if cost reductions could be made so that a variation of the November 5, 2001 plans could be constructed. DSMF, ¶ 44. The plaintiffs dispute this and assert that CDC provided Boulos with "90% complete" drawings on or about December 14, 2001, which, it believes, were given to Pochebit and used to discuss "value engineering."[2]

---

[2] The plaintiffs do not dispute the defendants' assertion at paragraph 41 of their statement of material facts that the latter gave the November 5, 2001 plans to Pochebit early that month and that Pochebit continued to work on numbers in December. PRSMF, § 41.

It is unknown if there are two sets of plans, one that was submitted to Pochebit in November, 2001, the "preliminary" or "draft" plan, and a second "90% complete" plan that was developed later and given to Pochebit on or about December 14, 2001. See DSMF, ¶ 41, PRSMF, ¶¶ 40, 42(b), 44; DRSMF, ¶ 44. The defendants deny that there was a second set of plans and assert that the only set given to Pochebit was dated November 5, 2001. They support this contention with record references showing that there was no transmittal letter for any December plans, that an invoice of December 28, 2001, was for

In February 2002, CDC was instructed to complete the drawings and specifications. CDC complied, and in February or March, 2002, CDC prepared the final drawings. The defendants claim that they gave this instruction so that they could use portions of the drawings in the event they decided to use value engineered plans. DSMF, ¶ 46. Moore denies this and states that he "was told that the project design was going to change dramatically due to the purchase of another dairy farm," ... and that "what you have designed will not be built as Owner no longer has the need. I want, however, for you to finish your design work so that I can close out your contract." PRSMF, ¶ 46 (quoting Paul Ureneck of Boulos). Moore claims, without contradiction, that he replied to this, confirming that CDC would:

> ... prepare 3 sets of final drawings and 3 specifications booklets & will plan on delivering these documents to your [sic] personally.... Immediately after that, I will prepare the above mentioned so that we can finalize my contract as per your request. The only item that will remain for you to do prior to construction is a professional engineers review that you chose not to do at this time.

*Id.*

Moore was also told in February, 2002, that the defendants wanted to reduce the cost of the dairy barn from the budget estimate of $2.8 million.

On March 8, 2002, Moore faxed to Ureneck an invoice for $233,811 which he claimed then, and now, to be the balance due CDC based on the project construction cost provided by Pochebit. Moore calculated this figure by applying 10% to the figure developed by Pochebit.[3]

---

"proofing" the November 5 plans, and that no new plans were produced for the December 28 invoice. DRSMF, ¶ 40.

[3] *See* DSMF, Exh. B, which shows CDC's final statement and the calculations used which also involved a separate fee for a related project.

On March 20, 2002, Moore went to Boulos' office and may have then resubmitted the faxed invoice for $233,811. Boulos refused payment and Moore refused to release the final plans without that payment.

The defendants assert that the plaintiffs never submitted an invoice for $42,000 for payment #5 under the payment schedule. CDC takes the position that the invoice which it submitted included what would have been payment #5.

The defendants also say that if Moore had submitted an invoice for $42,000 with his plans on March 20, 2002, they would have paid that sum. The plaintiffs reply that while the parties negotiated over a fee for the defendants to obtain the final plans, it is their position that the contract called for final payment before the plans would be left and the defendants have rejected that interpretation of their agreement.

After March, 2002, the defendants decided to build "an entirely different dairy barn facility than that designed by Coastal." DSMF, ¶ 59. Once built, it had a construction costs of $1.2 million. The plaintiffs assert that the barn built has significant similarities to the dairy complex it designed.[4] PRSMF, ¶ 59.

## III.   Discussion.

All parties agree that the contract, the "Agreement," is unambiguous and therefore its interpretation is a question of law which must be decided by a court. *American Protection Ins. Co. v. Acadia Ins. Co.*, 2003 ME 6, ¶ 11, 814 A.2d 989, 993. In doing so, the interpretation "must be determined from the plain meaning of the language used and from the four corners of the instrument without resort to extrinsic evidence." *Id.* (quoting *Portland Valve, Inc. v. Rockwood Sys. Corp.*, 460 A.2d 1383, 1387 (Me. 1983)). The court must look at the whole instrument and the contract should "be

---

[4] The defendants correctly point out that this assertion is based on hearsay and ought not to be considered in the disposition of this motion. *Searles v. Trustees of St. Joseph's College*, 695 A.2d 1206, 1210, n.2.

constructed to give force and effect to all of its provisions." *Id.* at 12 (quoting *Acadia Ins. Co. v. Buck Constr. Co.,* 2000 ME 154, ¶ 9, 756 A.2d 515, 517).

The defendants argue that CDC did not have the option or the right to skip over payment step #5 and go to step #6 and be paid its 10% design fee which was to occur only upon the defendants' receipt of the contractor's bid. Instead, the defendants argue, CDC was required to turn over the final plans in return for the $42,000 payment specified at step #5. After this, the contract envisions that a contractor's bid would be submitted, based on the final plans which would have been turned over on this occasion. Thereafter, when the contractor's bid is accepted by the owner, the construction cost could be determined and the 10% payment could be calculated as payment #6. Thus, the defendants argue, payment #6 could only occur when the actual construction cost could be figured, and not before then, and that that step was contingent upon the receipt of the final plans. So, they reason, because the final plans were withheld, no construction bid could be obtained, and it is not possible to calculate the applicable percentage of the contractor's bid because none could be obtained without the final plans.

The defendants also argue that even if the court ventured outside the four corners of the Agreement and examined the undisputed facts extrinsic to this document, it would reach the same result. More particularly, the defendants say that in order for the plaintiffs to have any argument that it could skip step #5 and proceed to step #6 they would have to establish that the Pochebit figures constituted the "contractor bid" cited in step #6. The plaintiffs cannot accomplish this, it is claimed, because there is no evidence that what Pochebit submitted was "a contractor bid."

The record cited by the defendants supports this contention. As noted, *infra,* Michael White of Pochebit has testified without contradiction that his firm provided "a

preliminary budget estimate for the project;" that it was "real preliminary ... a high and a low type of estimate ... it was a range." DSMF, ¶ 43. The defendants also point to evidence in the record that Moore appreciated that Pochebit's figures were an estimate. *See, e.g.*, DSMF, ¶ 39, PRSMF, ¶ 41. Thus, the evidence outside the contract would show that the figure against which CDC calculated the 10% design fee was not a contractor's bid, but, rather, an estimate used in the planning process for this project.[5] That being so, the plaintiffs may not use the figure they have relied on from Pochebit to assess their design fee and bill the defendants. Instead, the defendants say, CDC had to wait until after they had turned in the final plans and then calculate its bill based on a bid which would, in turn, be based on those plans.

Finally, the defendants argue, because the plaintiffs refused to turn over the plans so that the defendants could solicit and obtain a contractor's bid, they have breached the agreement and cannot be awarded the damages they seek. This is because Maine law provides that a party who breaches a contract by providing less than full performance of all its material provisions cannot rely on that contract to secure payment thereunder, but must turn to equitable remedies such as *quantum meruit* to recover for his services. *Loyal Erectors, Inc. v. Hamilton & Son, Inc.*, 312 A.2d 748, 756 (Me. 1973).

The plaintiffs have assembled a variety of arguments to overcome the defendants' interpretation of the Agreement.

First among these is the contention that the parties executed a single, nonseverable contract in that, they say, the payment steps do not correlate to the value of the work performed at each step. Accordingly, the plaintiffs are entitled to be paid for the complete design drawings they were asked to, and did, tender on March 20,

---

[5] Even if it turned out to be correct that Pochebit provided two estimates, one in November, the other in December of 2001, there is no evidence that either represented its bid on the project. Accordingly, it may be said, neither would trigger payment steps #5 or #6.

2002. At this time they would say they had completed their part of the contract and, apparently, could skip step #5. This would be justified because the plaintiffs were told to complete the plans but that the owner would not be building the barn CDC designed. Thus, it may be said, there was to be no contractor's bid on those plans so that steps #5 and #6 could be skipped. Said differently, once CDC was told to complete the drawings but that the building would not be built as they designed so that no contractor would be bidding on it, CDC was entitled to be paid its final design fee. Further, because there would be no contractor's bid, the best means of determining that fee would be to use the estimate submitted by Pochebit to construct the barn. Otherwise, there would be no way under the contract to calculate this fee. This purports to be a fair interpretation of the contract because the defendants had the option of terminating it and paying for only the work done but, once they asked for the final plans, they were bound to pay for them as the contract specified.

However, as the plaintiffs have acknowledged, the contract for CDC's performance was not completed on the delivery of the plans. CDC was also responsible for having them reviewed by a structural engineer and CDC was also responsible for participating in the construction process. Plaintiffs' memorandum, p. 10. The plaintiffs say the defendants waived this performance because the former were told to complete the final plans at which time the defendants would "close out" the contract. Upon the contract being "closed out" then, the plaintiffs were entitled to be paid for their plans on delivery as the contract specified, i.e., "Blueprints will not be left without final payment." Agreement, p. 2. It is argued that the failure of the defendants to pay for these plans as the contract required is a breach of that contract because the plaintiffs were prepared to tender performance, outside the elements which had been waived,

and the defendants refused to pay.[6] Upon that refusal, the plaintiffs say that under the quoted text of the contract they were entitled to retain the plans and not leave them without that final payment which action, therefore, would not constitute a breach on their part.

In the end, though, the parties' respective arguments, extrinsic evidence aside, amount to competing interpretations of the contract language and the ultimate question, what obligation under the contract did the defendants have when the plaintiffs tendered the final plans? Were the defendants required to pay the plaintiffs 10% of Pochebit's figures or was payment of $42,000 under step #5 called for?

In the court's view, the defendants' interpretation of the Agreement's provisions is the most persuasive. In this regard, a careful and fair reading of the payment schedule sheds light on the mutual obligations of the parties under the Agreement as here defined.

That schedule contemplated a series of payments culminating in a potential total of $150,000 which was 10% of a hypothetical $1.5 million building. Payment step #5, which calls for a $42,000 payment of the $150,000 total, can reasonably and logically be understood to mean that that payment would be made when the bid documents were delivered "[Dwgs & Specifications]" Agreement, p. 3; that is, when CDC delivered drawings and specifications sufficient to solicit construction bids, it was to be paid $42,000.

When the owner took the next step and obtained a contractor's bid, then CDC would be entitled to "Balance due [if any] balance of 10% design fee . . . " *Id.* But, as the defendants have argued, it was necessary to have the plans in order to obtain a contractor's bid and that the use of the phrase "if any" in this step meant that the

---

[6] The defendants have not argued that the plans CDC tendered were not fully satisfactory.

$42,000 might well be the final payment if the contractor's bid was at or less than $1.5 million. By similar reasoning, if the owner decided not to go forward with the building, it would be required to pay CDC the amount due under step #5, i.e., the "final payment" which would complete the payments for the original, albeit hypothetical, building with a projected cost of $1.5 million.[7]

In this regard, the court concurs with the defendants' reading of the case of *Fay, Spofford & Thorndike, Inc. v. Massachusetts Port Authority*, 387 N.E.2d 206 (Mass. App. Ct. 1979) to the effect that a design contract which contains an early termination design fee calculated against a specified cost of construction, as here, means that that fee is to be paid even when the owner changes the scope of the project. So, here, the defendants would be required to pay CDC the full $150,000, the percentage of the projected cost of the barn that was agreed to when it decided to alter course. When the plaintiffs chose not to deliver the final plans, however, the defendants were relieved of this obligation.

Finally, it is worth addressing the plaintiffs' argument that the Agreement text which states, "Blueprints will not be left without final payment" means that the defendants were required to pay the final design fee, i.e., 10% of construction cost, when the blueprints were delivered, so that if that sum were not paid, the blueprints could be withheld.

Assuming, as the parties do, that "blueprints" and "bid documents" . . . [Dwgs & Specifications] are synonymous, it would be illogical, as discussed, infra, to have the owners either commit to a bid or complete construction without having the blueprints first. Instead, as the defendants contend, it makes considerably more sense to interpret

---

[7] The fairness of this interpretation is manifest. The designer receives 10% of the anticipated project cost and is relieved of any further obligations to the owners while taking no risk that the actual construction cost might end up being lower than was projected. In return, the owners get a full set of plans to do with as they may wish except, arguably, build the barn actually designed.

this text as requiring the payment of the sum in step #5, which was the projected "final payment," as the event at which the blueprints would be left and that payment tendered. The effect of this part of the contract would be carried out if the defendants refused to make that "final payment" at which time the blueprints would not be left.

In the end, the court endorses the defendants' interpretation of the Agreement, namely that it unambiguously required the plaintiffs to satisfy their end of the bargain by delivering final plans for payment #5, namely $42,000, and upon this event construction bids could be obtained, or the project abandoned. If the former, the plaintiffs would continue to be bound to the project and, perhaps, be compensated further if the final construction costs exceeded $1.5 million; if the latter, they would have been paid the full 10% of the original projected cost of the dairy barn.

In the court's view, based on the undisputed facts extrinsic to the contract, and the contract language by itself as here interpreted, the plaintiffs breached the Agreement by not delivering the final plans and, therefore, cannot succeed with a breach of contract claim which contradicts the court's interpretation of that document, although their equitable claims may meet with a different fate. *Loyal Erectors, Inc. v. Hamilton & Son, Inc.*, 312 A.2d 748, 756 (Me. 1973).

Accordingly, for the reasons stated herein, the clerk is DIRECTED to make the following entry:

> Defendants' Motion for Partial Summary Judgment is GRANTED. Judgment is ENTERED for the defendants on count I of the Second Amended Complaint.

Dated: September 30 , 2004

John R. Atwood
Justice, Superior Court

this text as requiring the payment of the sum in step #5, which was the projected "final payment," as the event at which the blueprints would be left and that payment tendered. The effect of this part of the contract would be carried out if the defendants refused to make that "final payment" at which time the blueprints would not be left.

In the end, the court endorses the defendants' interpretation of the Agreement, namely that it unambiguously required the plaintiffs to satisfy their end of the bargain by delivering final plans for payment #5, namely $42,000, and upon this event construction bids could be obtained, or the project abandoned. If the former, the plaintiffs would continue to be bound to the project and, perhaps, be compensated further if the final construction costs exceeded $1.5 million; if the latter, they would have been paid the full 10% of the original projected cost of the dairy barn.

In the court's view, based on the undisputed facts extrinsic to the contract, and the contract language by itself as here interpreted, the plaintiffs breached the Agreement by not delivering the final plans and, therefore, cannot succeed with a breach of contract claim which contradicts the court's interpretation of that document, although their equitable claims may meet with a different fate. *Loyal Erectors, Inc. v. Hamilton & Son, Inc.*, 312 A.2d 748, 756 (Me. 1973).

Accordingly, for the reasons stated herein, the clerk is DIRECTED to make the following entry:

> Defendants' Motion for Partial Summary Judgment is GRANTED. Judgment is ENTERED for the defendants on count I of the Second Amended Complaint.

Dated: September 30 , 2004

John R. Atwood
Justice, Superior Court

Pltffs': **William Robitzek, Esquire**
Defs': **John Hobson, Esquire**