STATE OF MAINE                                          SUPERIOR COURT
CUMBERLAND, ss.                                         CIVIL ACTION
                                                        DOCKET NO. CV-05-693



JOHN D. ROCKEFELLER

        Plaintiff

                                                ORDER ON
        v.                                      CROSS-MOTIONS FOR
                                                SUMMARY JUDGMENT
ROCKPORT BUILDERS, LLC                          DONALD L. GARBRECHT
                                                LAW LIBRARY

        Defendant                               DEC 08 2006


        Before the Court is Plaintiff John D. Rockefeller's ("Plaintiff") motion for

summary judgment and Defendant Rockport Builders, LLC's (Defendant) cross-

motion for summary judgment. Both summary judgment motions raise the issue

of the breach of a contract between the parties.

### UNDISPUTED FACTS AND PROCEDURAL HISTORY

        Plaintiff and Larry Palmer ("Palmer") on behalf of Defendant signed a

purchase and sale agreement ("Agreement"), effective November 2, 2004, under

which Plaintiff agreed to buy a residential property improved with a new house

located in Rockport, Maine ("Property") for $675,000. Under amendments to the

Agreement, the closing date was set for April 29, 2005. In connection with the

Agreement, Plaintiff made a $25,000 earnest money deposit with a brokerage.

        Prior to signing the Agreement, Plaintiff, his wife and their broker toured

the Property, including the basement. In the basement, Plaintiff noticed some

"weepage," or a small amount of dampness, in a contained area of the floor. The

Property disclosure information provided by Defendant also noted "some ledge

weepage," which was the result of overpouring of concrete. There was a sump

1

pump in the basement, but no water other than the weepage was present at that time. There is some dispute over whether the weepage generated any water accumulation prior to the time Plaintiff viewed the basement, but at most the weepage and other conditions in the basement resulted in "some water" in the basement at times.

Section 9 of the Agreement provides:

> 9. POSSESSION, OCCUPANCY, AND CONDITION: Unless otherwise agreed in writing, possession and occupancy of premises free of tenants and occupants, shall be given to Buyer immediately at closing. Said premises shall then be broom clean, free of all possessions and debris, and in substantially the same condition as at present, excepting reasonable use and wear. Buyer shall have the right to view the property within 24 hours prior to closing for the purpose of determining that the premises are in substantially the same condition as on the date of this Agreement.

On April 26, 2005, Plaintiff and his broker conducted an inspection of the Property in anticipation of closing 3 days later. Exceptionally heavy rain had been falling and continued to fall over the next few days. There are varying accounts of how much water accumulated in the basement as of April 26. Plaintiff stated that half the basement floor was covered with water and the walls of a wine cellar in the basement were also in contact with water, Plaintiff's broker stated that 60%-70% of the basement floor was covered with water and the wine cellar's walls were wet, and Palmer, who went through the house later that day, claimed that water had collected about a half inch deep over a four foot square area in the vicinity of the wine cellar.

As a result of the flooding, Plaintiff's broker contacted Walter Lamont, Jr. ("Lamont"), a local experienced foundation contractor, and asked him to come to the Property and examine the basement to determine the source of the water. Lamont examined the basement with Palmer. Both Palmer and Lamont admit

2

seeing water entering the basement between the footer and the ledge, with Lamont characterizing this situation as water "pouring" in at that spot. This level of water flow, which in Lamont's opinion was the result of an inadequate seal where the footer was resting on the ledge as well as the lack of perimeter foundation drains, was as bad as Lamont had ever seen. The lack of perimeter drains was contrary to typical construction practices in recent years. The water entering the basement was unrelated to the weepage noted when Plaintiff first toured the Property. It is undisputed that, even in cases of exceptional rain, a basement should stay dry without the need for a sump pump.[1]

According to Lamont, it would require $10,000 worth of work to fix the problems that caused the flooding. Following this estimate, Plaintiff requested a one-week extension of the closing date. Palmer refused Plaintiff's request and instead offered to escrow $6,000 to address the situation. The closing did not occur on April 29, 2005 and Palmer refused to sign a release to permit the brokerage to return Plaintiff's earnest money. Subsequent to April 2005, Palmer himself conducted work to resolve the flooding problem.

Plaintiff filed his complaint on October 6, 2005 seeking a declaratory judgment that he was excused from closing on the Property due to Defendant's failure to deliver the premises in substantially the same condition it was in at the time of the Agreement and entitling him to the return of his full $25,000 in

---

[1] At oral argument, Defendant stated that it does not admit that a basement should stay dry, even during strong rain, without use of a sump pump. Plaintiff's statement of material facts, however, included the following: "Even with exceptional rain, a basement should stay dry without the need for a sump pump, which may be installed to dispose of ground water that collects underneath a foundation." (Supp. S.M.F. ¶ 33.) In its opposition, Defendant admits this fact without qualification. (Opp. S.M.F. ¶ 33.) As such, it is taken as undisputed by the parties.

earnest money deposit, as well as for damages in the amount of $5,581 from attorney's fees accumulated in contemplation of purchasing the Property. Defendant filed its amended answer on January 31, 2006, denying Plaintiff's claims and making a counterclaim for breach of contract. Plaintiff filed his memorandum in support of a motion for summary judgment and a statement of material facts on August 21, 2006. Defendant filed its memorandum in opposition to Plaintiff's motion and in support of its cross-motion for summary judgment and its response to Plaintiff's statement of material facts along with its additional statement of material facts on September 11, 2006. Plaintiff filed his reply memorandum and response to Defendant's additional statement of material facts on September 18, 2006.

## DISCUSSION

### I. Was Plaintiff's Reply Memorandum Timely Filed?

As an initial matter, at oral argument Defendant asserted that Plaintiff's reply memorandum and accompanying response to Defendant's additional statement of material facts was not timely filed. M.R. Civ. P. 7(e) states "[w]ithin 7 days of filing of any memorandum in opposition to a motion . . . the moving party may file a reply memorandum . . . . " Defendant argues that its opposition to Plaintiff's motion for summary judgment was mailed significantly before the date on which the Court received it. The Court received defendant's motion opposing summary judgment on September 11 and Plaintiff's reply on September 18. If Defendant's opposition was "filed" on September 11, Plaintiff's reply was timely filed. If, however, Defendant's opposition was "filed" upon mailing, Plaintiff's reply was filed outside Rule 7(e)'s time limit, resulting in Defendant's additional statement of material facts being deemed admitted.

4

Defendant's timing argument needs to be dealt with only briefly because it is clearly incorrect. By its plain language, Rule 7(e) marks the time limit for filing a reply memorandum as running from "filing" of an opposition memorandum. M.R. Civ. P. 5(e) explicitly defines "filing with the court" as follows: "The filing of pleadings and other papers with the court as required by these rules shall be made *by filing them with the clerk of the court . . . .*" (emphasis added). Therefore, the unambiguous meaning of Rule 7(e), when read in conjunction with Rule 5(e), is that the time limit for filing a reply memorandum to a memorandum in opposition to summary judgment runs from when the clerk of the court receives the opposition memorandum. In fact, a published decision addressing this very issue reiterates that "'filing' occurs when the pleading is filed with the clerk." *Fleet Bank of Me. V. Dumont,* 2000 Me. Super. LEXIS 138, *3 (June 22, 2000).

Defendant cites no case law supporting its interpretation of Rule 7(e). Defendant's only support for its argument stems from the statement in M.R. Civ. P. 6(c) that "[w]henever a party has the right or is required to do some act . . . within a prescribed period after the *service of notice* or other paper upon the party and notice or paper is served upon the party by mail, 3 days shall be added to the prescribed period." (emphasis added). It is questionable whether the substance of this rule provides any support for Defendant's position. The Court need not reach the substance, however, as Rule 6(c) clearly states that it only applies when a party must do some act within a period of time after the service of notice. Rule 7(e) requires a party to file reply materials within 7 days after filing, not after service of notice. As a result, Plaintiff's reply to Defendant's additional statement of material facts was timely filed.

5

## II. Was the Basement in "Substantially the Same Condition" at Closing as at the Time of the Agreement?

The merits of Plaintiff's declaratory judgment cause of action and Defendant's breach of contract cause of action turn on whether the basement was in "substantially the same condition" within the meaning of the Section 9 of the Agreement on April 26, 2005, when Plaintiff, his broker and Palmer witnessed flooding in the basement of the Property, as when the Agreement was signed on November 2, 2004. In interpreting a contract, its language must be given its plain meaning. *Am. Prot. Ins. Co. v. Acadia Ins. Co.*, 2003 ME 6, ¶ 13, 814 A.2d 989, 993.

Plaintiff argues that the plain language of the contract states that the property was required to be in "substantially the same condition" at the time of his examination on April 26, 2005 as it was at the time of the Agreement, and that the degree of flooding present in the basement rendered the condition otherwise. Specifically, Plaintiff argues that water "pouring" into the basement at an opening where the footer was connected to the ledge and flowing across the basement floor is not substantially the same as the condition of the basement at the time of the Agreement for three reasons.

First, Plaintiff argues that, although he noted some weepage in the basement at the time of his first inspection, this is fundamentally different from water actively entering the basement and accumulating in amounts far beyond mere dampness on April 26, 2005. Further, Plaintiff notes that the $10,000 repair bill quoted by Lamont, as well as the substantial, though undocumented, cost incurred by Palmer when he fixed the problem himself, prove that the basement was in a substantially different condition on April 26, 2005 than at the time of the Agreement. Lastly, Plaintiff argues that the characterization of the amount of rain

that caused the flooding as exceptional as well as the existence of a sump pump in the basement potentially warning that flooding could occur are both irrelevant as to the issue of the basement's condition at the time of the Agreement.

In contrast, Defendant focuses on the fact that there was no "damage" to the basement as proof that it was in compliance with Section 9 of the Agreement.[2] Defendant also argues that the presence of water in the basement should have come as no surprise to Plaintiff due to the presence of a permanent sump pump.

It is unclear why the existence of the sump pump is relevant. Both parties agree that a basement should stay dry, even during periods of exceptionally strong rain, without resort to a sump pump. Further, even if the sump pump put Plaintiff on notice that the basement might be wet at times, that does not change the fact that the conditions present in the basement on April 26, 2005 were not the same as at the time of the Agreement. Specifically, while there was only a small amount of weepage in the basement at the time of the Agreement, water

---

[2] Defendant notes that, in his complaint, Plaintiff claims there was mold detected in the basement prior to the closing date that was not previously present, and that the water infiltration caused damage to the basement. (Pl.'s Compl. ¶¶ 31, 32.) From this, Defendant concludes that Plaintiff's summary judgment motion requires proof that there was some mold in the basement or "damage" to the structure of the house in order to prevail. Plaintiff's complaint, however, does not allege that the existence of damage and mold are necessary to succeed on his cause of action. Plaintiff's allegation is that "the water infiltration observed . . . *and* the damage caused thereby" caused him to conclude that the premises was not in substantially the same condition as at the time of the Agreement. (Pl.'s Compl. ¶ 31) (emphasis added). Further, under Count I of Plaintiff's complaint, he merely states that he was excused from going through with the closing due to the premises not being in substantially the same condition as it was previously. (Pl.'s Compl. ¶ 40(a).) Because of this and because Plaintiff does not argue on summary judgment that mold or damage to the house supports his claim, proving the existence of these factors is not necessary. Rather, Plaintiff argues that the flow of water into the basement and the accumulation of water there on April 26, 2005 rendered the house not in substantially the same condition as at the time of the Agreement.

was "pouring" into the basement and accumulating in significant amounts there on April 26, 2005.

Defendant's argument that there must be some "damage" to the basement for it to be in a different condition from the time of the Agreement does not comport with the plain language of Section 9 of the Agreement, nor is it supported by the full context of the language of Section 9. The relevant part of Section 9 states "[s]aid premises shall then be broom clean, free of all possessions and debris, and in substantially the same condition as at present, excepting reasonable use and wear." This language evidences a concern with more than just damage to the physical structure of the house, but also with the conditions inside the house. Under Defendant's interpretation, if Plaintiff arrived at the Property on April 26, 2005 and, instead of finding water flowing into the basement and covering the floors, found rats or cockroaches covering the basement, he would not have been permitted to avoid closing a few days later in the absence of damage caused to the physical structure of the house by the infestation. Just as a house with this kind of infestation is not in substantially the same condition as one without an infestation, a house with water pouring into the basement and accumulating on the floor is not in substantially the same condition as one with some weepage in one section of the basement.

III. Money Damages

Plaintiff presented no support for its claim that damages should include all costs expended in contemplation of closing on the Property. As there does not appear to be any legal basis for awarding these costs, summary judgment against Plaintiff on this issue is appropriate.

The entry is:

> Plaintiff's motion for summary judgment is GRANTED as to Count I (Declaratory Judgment). The Court declares that Plaintiff was excused from closing on the Property due to Defendant's failure to deliver the premises in substantially the same condition it was in at the time of the Agreement. Summary Judgment in favor of Defendant on Count II of Plaintiff's complaint (Money Damages) is GRANTED. Summary Judgment in favor of Plaintiff on Defendant's counter-claim (Breach of Contract) is GRANTED.

Dated at Portland, Maine this _11th_ day of _October_, 2006.

Robert E. Crowley
Justice, Superior Court

9

OURTS
County
287
4112-0287

ERIC MORSE ESQ
PO BOX 248
ROCKLAND ME 04841-0248

OURTS
County
287
04112-0287

DAVID SILK ESQ
CURTIS THAXTER STEVENS BRODER & MICOLEAU
PO BOX 7320
PORTLAND ME 04112