STATE OF MAINE                                    SUPERIOR COURT
CUMBERLAND, ss                                    CIVIL ACTION
                                                  Docket No. CV-06-718 219
                                                  TED-Cum-1/28/2008

ROBERT DUGGAN,

            Plaintiff

    v.                                            **DECISION AND ORDERS
                                                  ON DEFENDANTS' MOTIONS FOR
                                                  SUMMARY JUDGMENT**

NORTH EAST INSURANCE COMPANY
and DAIRYLAND INSURANCE COMPANY,                  DONALD L. GARBRECHT
                                                       LAW LIBRARY

            Defendants                                  FEB 15 2008

## I. BEFORE THE COURT

This case comes before the court on motions for summary judgment filed by both

defendants, North East Insurance Company ("North East") and Dairyland Insurance

Company ("Dairyland").

## II. PROCEDURAL HISTORY AND BACKGROUND

The plaintiff, Robert Duggan ("Duggan"), is seeking insurance proceeds in

satisfaction of a default judgment issued in his favor against Jamie Jackson ("Jackson")

as a result of Jackson's negligence in a motorcycle accident. The accident occurred in

the early morning hours of July 12, 2003. At the time of the accident, the two men were

driving motorcycles that they had taken from Colonial Auto Repair ("Colonial"), the

place where Jackson worked. Mark Flanigan ("Flanigan"), the owner and president of

Colonial, owned the Yamaha motorcycle driven by Duggan. Randall Akers ("Akers"), a

personal friend of Flanigan, owned the Harley Davidson motorcycle driven by Jackson.

Duggan believed that the Harley was for sale because he had seen it with other vehicles

that were for sale, and he claims he was interested in buying it. However, Dairyland

asserts that Flanigan was only storing the motorcycle for Akers and that neither motorcycle was for sale.

Prior to picking up the motorcycles, Duggan and Jackson had dinner and drinks together at a local restaurant. They then drove to Colonial at approximately 11:00 pm. Colonial was closed when they arrived and Jackson entered the premises with a key that Flanigan had given him as an employee. Additionally, Jackson knew the code to disarm the alarm, and was the only employee at Colonial with that knowledge. Normal business hours at that time were from 8:00 am to 5:00 pm Monday through Friday, and 8:00 am to 12:00 pm on Saturday. Jackson put license plates on the motorcycles and the men then left the premises. At the time, Duggan's license restricted him from operating a motor vehicle with any amount of alcohol in his blood.

Immediately after they left Colonial, they drove back to the restaurant where they had previously eaten at so that Mr. Jackson could see if a woman who was there would go for a ride with them. She declined his offer. The two men then traveled to various locations including Jackson's house, a beach on Long Lake, two bars, and a friend's house. Both men drank more alcohol during the night. Eventually, they were involved in an accident at approximately 1:45 am, and both men were seriously injured. Duggan sued Jackson for negligence, and was awarded a default judgment in the amount of $1,754,000.

Duggan subsequently filed a complaint against North East and Dairyland seeking insurance proceeds to satisfy the judgment. After answering and engaging in discovery, both North East and Dairyland filed motions for summary judgment.

## III. DISCUSSION

### A. Standard of Review

Summary judgment is proper where there exist no genuine issues of material fact such that the moving party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c); *see also Levine v. R.B.K. Caly Corp.*, 2001 ME 77, ¶ 4, 770 A.2d 653, 655. A genuine issue is raised "when sufficient evidence requires a fact-finder to choose between competing versions of the truth at trial." *Parrish v. Wright*, 2003 ME 90, ¶ 8, 828 A.2d 778, 781. A material fact is a fact that has "the potential to affect the outcome of the suit." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573, 575. "If material facts are disputed, the dispute must be resolved through fact-finding." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18, 22. At this stage, the facts are reviewed "in the light most favorable to the nonmoving party." *Lightfoot v. Sch. Admin. Dist. No. 35*, 2003 ME 24, ¶ 6, 816 A.2d 63, 65.

### B. Reach and Apply Statute

Under 24-A M.R.S. § 2904, when a person has received a favorable judgment, he or she may seek to satisfy that judgment through any available insurance money "if when the right of action accrued, the judgment debtor was insured against such liability and if before the recovery of the judgment the insurer had had notice of such accident, injury or damage." Neither North East nor Dairyland argue lack of notice, but each argues that Jackson was not covered by the particular policy in question when the accident occurred.

### C. North East's Motion for Summary Judgment

#### 1. Liability

The first issue presented is whether the North East Insurance policy covering vehicles at Colonial Autos Sales protected Jackson against liability when he operated the Harley Davidson motorcycle owned by Akers. To answer this question, the court

3

must first determine whether or not the policy is ambiguous, which is a question of law. *American Protection Insurance Co. v. Acadia Insurance Co.* 2003 ME 6, ¶ 11, 814 A.2d 989, 993. If the language in the policy is "reasonably susceptible of different interpretations" it is considered ambiguous. *Id.* If the court finds that the language is unambiguous, "its interpretation is also a question of law," and the court will look at the "plain meaning of the language used and from the four corners of the instrument without resort to extrinsic evidence." *Id.* If the language is ambiguous, it is interpreted strictly against the insurance company. *Hall v. Patriot Mutual Insurance Co.*, 2007 ME 104, ¶ 21, ___A.2d___.

Under the terms of the policy, liability only attaches when the insured, or someone with the insured's permission[1], uses a vehicle in connection with "garage operations," which are defined as follows:

> "Garage operations" means the ownership, maintenance or use of locations for garage business and that portion of the roads or other accesses that adjoin these locations. "Garage operations" includes the ownership, maintenance or use of the "autos" indicated in SECTION I of this Coverage Form as covered "autos". "Garage operations" also include all operations necessary or incidental to a garage business.

According to the plain language of the policy, it is clear that North East would not cover any liability resulting from the operation of a vehicle that was not being used as part of the garage business for Colonial.

Duggan argues that Jackson did not need permission from Flanigan to drive Akers' motorcycle because Jackson, as an employee of Colonial, was an insured under the policy. Furthermore, Duggan claims that Jackson was engaged in garage operations on the night that Jackson drove the Harley. Duggan contends that he was interested in purchasing the Harley Davidson motorcycle owned by Akers, and that Jackson

---

[1] The named insured on the policy is Colonial Auto Sales, *et al.*

4

represented to him that he would be able to test-drive it. He points to the ability of Jackson to access the shop after hours as evidence that Jackson was entitled to bring customers to the shop late at night in order to test drive vehicles. Although Duggan did not actually drive the motorcycle that he claims he was interested in buying, he maintains that Jackson said he was only going to "warm up" the Harley before allowing Duggan to drive it. Finally, he asserts that it is up to the fact-finder to decide if these circumstances constitute garage operations.

North East disagrees with Duggan's claim that Jackson is an insured under the policy and thus did not need permission to operate Flanigan's motorcycle. They note that Jackson himself signed a mutual release with Colonial admitting that Flanigan did not give him permission to be at the business after hours or to operate the motorcycles. Furthermore, although North East admits that test-driving a vehicle would be considered garage operations, they argue that the circumstances of the night in question were so far removed from a test drive that it is impossible to assert otherwise. They point out that Duggan drove the Yamaha all evening, not the Harley that he wanted to buy. Additionally, they stress the late hour of the alleged test drive, and the fact that both men were drinking alcohol as proof that this could not be considered a test drive.

### 2. Is Jackson as an Insured

The language of the policy that defines who is an insured for purposes of liability is as follows:

> (1) You for any covered "auto."
> (2) Anyone else while using with your permission a covered "auto" you own, hire or borrow except:
> ...(b) Your "employee" if the covered "auto" is owned by that "employee" or a member of his or her household.

The unambiguous language of the § 2(b) exception makes it clear that employees are not considered insured unless they have permission from Colonial, because they cannot

simultaneously fit into the "You" category and the "Anyone else" category. This exception would not make any sense if employees were intended to be included in the definition of "You." If that were the intended meaning, the exception would simply state that "You" could not be considered an insured when "You" or "a member of [your] household" owns the covered auto. Because the policy clearly treats employees as "Anyone else," Jackson would need Flanigan's permission to operate the Harley to be covered for liability.[2]

North East has presented evidence in the form of testimony from Flanigan and the mutual release signed by Jackson to show that Jackson did not have permission from Flanigan to use either motorcycle or to go into the shop after business hours. Duggan admits that Jackson signed the release, but claims that the issue of permission "is a matter of law to be decided by a trier of fact."[3] However, Duggan has not pointed to anything in the record that would show Flanigan's permission to operate the motorcycles on the night in question other than the fact that Jackson had a key to the shop and the access code to disarm the alarm. It is irrelevant to the question of permission that Duggan believed the Harley was for sale. Also, although Duggan asserts that it is reasonable to believe that Jackson thought he had permission to be on the premises after hours in order to sell a motorcycle, he does not provide any factual support for his assertion.[4] Nor does he explain why what Jackson might have thought is relevant to the question of whether he actually had permission. In any event, the mutual release states otherwise.

---

[2] This assumes that Akers' Harley is even considered a covered vehicle under the North East policy.

[3] The court assumes that Duggan made a mistake in this characterization and means that it is a question of fact.

[4] There is no deposition of Jackson included in the record, the court cannot discern what exactly Jackson thought and does not speculate on that fact.

### 3. Garage Operations

Even if an argument could be made that Jackson somehow had permission from Flanigan to operate a motorcycle owned by Flanigan's friend after business hours, which the record before the court does not support, Duggan would still have to show that Jackson was engaged in garage operations at the time of the accident. Although Duggan argues that this is a question of fact, it is difficult to imagine how the activities of Duggan and Jackson could be characterized as garage operations. Even if Duggan was interested in buying the Harley and in test-driving it, he exclusively drove the Yamaha on the night of the accident. Both men had been drinking before they got to Colonial, and continued to do so after picking up the motorcycles. Contrary to claims made by Duggan, these facts preclude a finding that Jackson could have been engaged in garage operations at the time of the accident.

### 4. Uninsured Motorists Provision

Under the terms of the policy governing uninsured motorists coverage, recovery is prohibited when a person "us[es] a vehicle without a reasonable belief that the person is entitled to do so." According to the Law Court, "a person lacks a reasonable belief if that person: (i) knows that he or she is not entitled to use the vehicle; or (ii) lacks objectively reasonable grounds for believing that he or she is entitled to use the vehicle." *Craig v. Barnes*, 1998 ME 110, ¶ 7, 710 A.2d 258, 260. When actual knowledge that one was not permitted to drive is absent, but a person believed he or she was entitled to drive,

> [t]he court must consider any fact relevant to the objective reasonableness of that person's belief. Relevant facts may include his or her ownership of the vehicle, receipt of permission for use from the named insured, relationship to the named insured, prior usage of the vehicle, and legal entitlement to drive. No one fact is dispositive. *Id.* ¶ 8, 710 A.2d at 260.

7

Therefore, contrary to Duggan's claim that the question of his reasonable belief belongs solely to the fact finder, this court is expected to engage in an analysis of whether the facts support a finding of an objectively reasonable belief.

Here, Duggan argues that it was reasonable for him to believe that he was entitled to operate the Yamaha because he knew that Jackson was an employee of Colonial and thought that Jackson was a sales and service manager. He asserts that they both went to Colonial together, that Jackson got the keys to the motorcycles, put license plates on them, and told Duggan he could drive the Yamaha. North East again points to the circumstances of the evening in question to rebut the argument that Duggan had any such reasonable belief. They argue that there is no way that Duggan could have reasonably believed that he was entitled to operate Flanigan's motorcycle because, in addition to the late hour and the alcohol involved, Duggan's license was under a restriction that prohibited him from operating a motor vehicle with any amount of alcohol in his blood.

This is not a situation where the shop was in the middle of closing or had recently closed. At the time the two men arrived at Colonial to get the motorcycles, the shop had been closed for approximately six hours. Both men had been drinking when they took the motorcycles and they continued to drink after they left the shop with the motorcycles, visiting two bars and a friend's house with the motorcycles. They even tried to pick a woman up at the restaurant they ate dinner and consumed alcohol earlier that evening. Their late night adventure had more characteristics of a joy ride than a tes drive; especially considering the fact that Duggan never even drove the motorcycle he was purportedly interested in buying. Furthermore, Duggan should not have been driving that night at all because of the restriction on his license. Given these

circumstances, any belief that Duggan may have had about his entitlement to operate Flanigan's motorcycle was not objectively reasonable.

## D. Dairyland's Motion for Summary Judgment

The issue to be decided on Dairyland's motion is whether Jackson was an insured under the motorcycle insurance policy issued to Akers. See *Taylor v. U.S. Fidelity and Guar. Co.*, 519 A.2d 182, 182 (Me. 1986). Again, this court must first decide whether or not the policy is ambiguous. *American Protection Insurance Co.*, 2003 ME 6, ¶ 11, 814 A.2d at 993. In addition to coverage for operation by Akers, under the terms of the Dairyland policy regarding both liability and uninsured motorist insurance, coverage extends to those who operate the insured motorcycle when they have permission to do so from Akers. Duggan argues that the language of the policy is ambiguous, because it does not define whether permission must be express, or whether it can also be implied. Dairyland asserts that the Law Court has previously upheld a grant of summary judgment for a defendant insurance company when a virtually identical provision was at issue. See *Taylor*, 519 A.2d at 182. Dairyland points out that the Court in *Taylor* did not hold the language to be ambiguous.

In *Taylor*, the cousin of an employee who had limited permission from his employer to use a company car took the car without the employee's permission and was later involved in an accident. *Id.* One of the passengers was killed and the others were injured. *Id.* The surviving passengers and the personal representative of the deceased passenger brought suit against the employer's insurance company to satisfy default judgments against the driver. *Id.* The Law Court determined that there was nothing in the record to support the claim that the scope of the employer's permission, whether express or implied, to allow the employee to use the vehicle extended to "a

9

member of an employee's household to use the vehicle for that third person's social purposes." *Id.* at 184.

The circumstances in this case are not exactly identical to those in Taylor, because here the employee himself was operating a motorcycle that was not owned by his employer. However, it is still necessary to determine whether there is anything in the record before this court that would suggest that Jackson had either express or implied permission to operate the motorcycle owned by Akers. Dairyland has presented evidence that Akers did not give permission to Jackson or anyone else to operate his motorcycle, and that he retained the only set of keys because he did not want anyone driving it.[5] Additionally, Dairyland asserts, and Duggan admits, that Flanigan never told him that he had permission to operate the motorcycle.

Duggan argues that there are genuine issues of material fact as to whether Akers gave implied permission to Colonial to operate his motorcycle, and whether Jackson, as an employee, exceeded the scope of that permission. He asserts that it is possible that the motorcycle was not in fact being stored on the premises for Akers, but was actually for sale, because he had seen it on display at Colonial in a manner that suggested as such. He claims that he believed that Jackson was the sales and service manager at Colonial, and that they were at Colonial on the night of the accident to test the motorcycle. At the very least, he argues, Akers surely knew that his motorcycle would be moved as needed by employees.[6]

According to the Law Court, "implied permission differs little from express permission except that it is proved circumstantially from conduct which evidences an

---

[5] Duggan claims that there was a set of keys to the Harley at Colonial because Jackson used them to start it.

[6] Duggan does not provide any factual support for this claim.

10

actual intent to permit certain actions." *American Motorists Insurance Co. v. LaCourse*, 314 A.2d 813, 817 n. 1 (Me. 1974). Therefore, even if the term "permission" in the policy included implied permission, Duggan would still have to present evidence that Akers' behavior indicated that he intended to allow Jackson to use his motorcycle in order to survive summary judgment. Even assuming for purposes of argument that Akers had delivered his motorcycle to Colonial for sale instead of mere storage, and that in doing so, he impliedly authorized Colonial employees to use the motorcycle for that purpose, there is nothing in the record that supports the claim that Akers' impliedly permitted Jackson (or any other Colonial employees) to take his motorcycle out after business hours and after he had been drinking, let alone drive it to a restaurant, Jackson's house, a beach, two bars and a friend's house.[7]

## IV. DECISION AND JUDGMENT

The clerk will make the following entries as the Decision and Judgment of the court:

A. Defendant North East Insurance Company's Motion for Summary Judgment is granted.

B. Defendant Dairyland Insurance Company's Motion for Summary Judgment is granted.

C. Judgment is entered for each defendant.

D. No costs awarded.

SO ORDERED.

Dated: _January 28 2008_

Thomas E. Delahanty II
Justice, Superior Court

---

[7] Additionally, Duggan has admitted all but four of Dairyland's statements of material fact. None of the four statements qualified by Duggan were properly controverted under Rule 56(h)(4), which requires a record citation for each qualification or denial. Absent such a citation, the court may deem the improperly controverted statements admitted.

MICHAEL WELCH ESQ
HARDY WOLF & DOWNING
PO BOX 3065
LEWISTON ME 04243-3065

H1Z-UZ8/

KEVIN LIBBY ESQ
MONAGHAN LEAHY
PO BOX 7046
PORTLAND ME 04112-7046

MARTICA DOUGLAS ESQ
DOUGLAS DENHAM BUCCINA & ERNST
PO BOX 7108
PORTLAND ME 04112-7108