# United States Court of Appeals
## For the First Circuit

Nos. 14-1380
     14-1438

LYMAN MORSE BOATBUILDING, INC. and CABOT LYMAN,

Plaintiffs, Appellees, Cross-Appellants,

v.

NORTHERN ASSURANCE COMPANY OF AMERICA,

Defendant, Appellant, Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl and Kayatta, Circuit Judges.

James D. Poliquin, with whom Norman, Hanson & DeTroy, LLC was
on brief, for appellant/cross-appellee Northern Assurance Company
of America.
Robert C. Hatch, with whom Leonard W. Langer, Hillary J.
Bouchard, and Thompson & Bowie, LLP were on brief, for
appellees/cross-appellants Lyman Morse Boatbuilding, Inc. and Cabot
Lyman.

December 2, 2014

**LYNCH, <u>Chief Judge</u>**. Lyman Morse Boatbuilding, Inc. (LMB) of Maine contracted to build a luxury yacht for Russ Irwin. Unhappy with the completed yacht, in 2011 Irwin brought an arbitration proceeding against LMB and Cabot Lyman, the controlling owner of LMB, alleging that the vessel had numerous defects. LMB and Cabot Lyman tendered defense of the arbitration complaint to their insurer, Northern Assurance Company of America, but Northern Assurance refused to defend the insureds. So the insureds filed this federal suit in 2012 seeking to recover the costs and attorneys' fees that they incurred in the arbitration proceeding.

The district court held that Northern Assurance had a duty to defend Cabot Lyman, the individual, but not LMB, the corporation; it then awarded to Cabot Lyman 50 percent of the attorneys' fees incurred during the arbitration by the two insureds together. Each side was unhappy and we are faced with appeals and cross-appeals. We conclude that on the pertinent facts Northern Assurance owed neither insured a defense under Maine law. Thus, we affirm in part, reverse in part, and remand for entry of judgment in favor of Northern Assurance.

I.

A.      <u>The Arbitration Demand</u>

On July 22, 2011, Irwin filed an arbitration complaint against LMB and Cabot Lyman, claiming damages related to the allegedly defective construction of a 52-foot custom sailing

-2-

vessel.[1]  Irwin alleged that LMB and Cabot Lyman had agreed to build the vessel "with the 'best practices for quality yacht construction' using the 'highest quality materials'" for a price of $2,155,000.  However, there were cost overruns, and Irwin eventually ended up paying over $3,400,000 for the completed vessel.  Moreover, upon LMB's delivery of the vessel to Irwin, Irwin allegedly discovered multiple defects, which necessitated a series of rejections and repairs.  As of the date of filing of the arbitration complaint, the quality of the vessel was still unsatisfactory to Irwin.

That complaint alleged eight causes of action: intentional fraud, negligent misrepresentation, constructive fraud, breach of contract, rejection and revocation of acceptance under the Uniform Commercial Code, breach of the implied warranty of fitness for a particular purpose, breach of the implied warranty of merchantability, and violations of Maine's unfair trade practices laws.  Irwin requested rescission of the agreement and a refund and damages for the time he spent and the expenses he incurred during the period when he repeatedly rejected the yacht because of its defects, as well as "the return . . . of the amounts overpaid to [LMB and Cabot Lyman] and the difference between the value of the

_____

[1]    The "Yacht Construction Contract" applicable to the transaction contains an arbitration clause providing that "[a]ny dispute arising from this agreement will be resolved via binding arbitration."

'highest quality' version of the Vessel that [LMB and Cabot Lyman] represented that [Irwin] would receive and the actual version [Irwin] received." He also requested punitive damages, attorneys' fees and costs, interest, and "such other and further relief as the Court deems just and proper."

The arbitration complaint contained two paragraphs naming Cabot Lyman. First, Irwin alleged that Cabot Lyman, the controlling owner of LMB, was the alter ego of the corporation, and alleged that "[a] unity of interest exists between [Cabot] Lyman and [LMB] and injustice and fraud can only be avoided by piercing the corporate veil" and holding Cabot Lyman jointly and severally liable for the wrongs alleged.

Second, in the course of alleging violations of Maine's unfair trade practices laws, the complaint stated that LMB and Cabot Lyman

> made further repeated representations and promises to [Irwin] about "best practices" and "highest quality" construction that they guaranteed for the completion of the Vessel . . .; for example, [Cabot] Lyman expressly represented to [Irwin] that he had extensive experience sailing worldwide including in the Caribbean and he was aware of the most common problems [Irwin] would encounter during his travels in tropical and other varying conditions . . .; as such he assured the Vessel would be completed to withstand these issues.

After the insurer refused their request for defense, LMB hired a law firm, Thompson & Bowie, LLP, to represent both it and

-4-

Cabot Lyman in the arbitration.  That firm then filed this lawsuit on behalf of the insureds, seeking to recover from Northern Assurance the costs and attorneys' fees incurred in the arbitration.[2]  LMB and Cabot Lyman also brought a claim for unfair claims settlement practices, contending that Northern Assurance had not made a coverage decision in a timely manner.

B.        The CGL Insurance Policy

On January 4, 2008, Northern Assurance had issued a package insurance policy to LMB and Cabot Lyman.  The named insureds listed in the Declarations of the policy are "Lyman Morse Boatbuilding Co., Inc." and "Cabot & Heidi Lyman ATIMA."  "ATIMA" stands for "as their interests may appear."  Section III of the package policy provides the insureds with Commercial General Liability (CGL) insurance.  It states in relevant part as follows:

> Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. . . .
> . . . .
>         a.    We will pay those sums that the Insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the Insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against

_____

[2]    The district court found that LMB paid or reimbursed all of Cabot Lyman's attorneys' fees.

any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .
b. This insurance applies to "bodily injury" and "property damage" only if:
(1) The "bodily injury" or "property damage" is caused by an "occurrence" . . . .

"Property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured."  "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  "'Suit' means a civil proceeding in which damages because of . . . 'property damage' . . . to which this insurance applies are alleged," and includes "[a]n arbitration proceeding in which such damages are claimed and to which the Insured must submit."

Importantly, the policy excludes from coverage "'[p]roperty damage' to 'your product' arising out of it or any part of it."  This exclusion, common to CGL policies, is generally called the "your product" exclusion.  "Your product," in turn,

a. Means:
(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:
(a) You;
(b) Others trading under your name; or

                    (c) A person or organization
                        whose business or assets you
                        have acquired; and
               (2) Containers (other than vehicles),
                    materials, parts or equipment
                    furnished in connection with such
                    goods or products.
          b.   Includes
               (1) Warranties or representations made
                    at any time with respect to the
                    fitness, quality, durability,
                    performance or use of "your
                    product"; and
               (2) The providing of or failure to
                    provide warnings or instructions.

C.        The Proceedings in the District Court

     On cross-motions for summary judgment, the district court held that Northern Assurance had no duty to defend LMB, but that it did have an obligation to defend Cabot Lyman in the arbitration proceeding. Lyman Morse Boatbuilding, Inc. v. N. Assurance Co. of Am., Inc., No. 2:12-cv-313-DBH, 2013 WL 5435204, at *1 (D. Me. Sept. 27, 2013) [hereinafter Lyman I]. The court held that the "your product" exclusion excused Northern Assurance from any duty to defend LMB because the only "property damage" alleged by the arbitration demand was to the yacht built by LMB. Id. at *4. "There is no suggestion" in the arbitration demand, the court explained, "that somehow the yacht's defects damaged other property." Id.

     However, the court determined that Northern Assurance did have a duty to defend Cabot Lyman, the individual, notwithstanding

the "your product" exclusion, because "[t]he yacht was the boatyard's product, not Cabot Lyman's product." Id. at *5.[3]

In a separate order on the issue of damages, the district court held that Cabot Lyman was entitled to recover 50 percent of the attorneys' fees that LMB and Cabot Lyman jointly incurred in defending the arbitration proceeding. Lyman Morse Boatbuilding, Inc. v. N. Assurance Co. of Am., Inc., No. 2:12-cv-313-DBH, 2014 WL 901445, at *1, *4 (D. Me. Mar. 6, 2014) [hereinafter Lyman II]. Reasoning that "[b]oth the corporation and the individual needed a defense, [and that] the nature of their defenses overlapped substantially, albeit not entirely," the court concluded that an equal division of fees between the corporation and the individual was appropriate. Id. at *3-4.

D.      This Appeal

Northern Assurance has appealed, arguing that it did not owe a duty to defend Cabot Lyman in the arbitration proceeding, and LMB and Cabot Lyman have cross-appealed, arguing that Northern Assurance did owe a duty to defend LMB. Both parties contend that the district court's ruling on the duty to defend and the damages issue was error.

---

[3]    The court also held that Irwin's claims for economic loss were not covered by the policy, see Lyman I, 2013 WL 5435204, at *2, *4 & n.10, and that Northern Assurance was entitled to summary judgment on the insureds' claim of unfair claims settlement practices, see id. at *5-6. Those rulings are not at issue on appeal.

-8-

II.

"The district court's conclusion on the duty to defend is reviewed de novo." Metro. Prop. & Cas. Ins. Co. v. McCarthy, 754 F.3d 47, 49 (1st Cir. 2014) (citing Bucci v. Essex Ins. Co., 393 F.3d 285, 290 (1st Cir. 2005)); see also Mitchell v. Allstate Ins. Co., 36 A.3d 876, 879 (Me. 2011) (analysis of insurer's duty to defend under Maine law is a pure question of law reviewed de novo).

The parties agree that Maine law applies to this dispute. To determine whether an insurer owes its insured a duty to defend, Maine courts apply the "comparison test," which involves a "comparison of the allegations in the underlying complaint with the provisions of the insurance policy" to determine if the claims alleged are within the coverage of the policy. Mitchell, 36 A.3d at 879. "[A]n insurer must provide a defense if there is any potential that facts ultimately proved could result in coverage." Id.; accord Howe v. MMG Ins. Co., 95 A.3d 79, 81 (Me. 2014) (quoting Cox v. Commonwealth Land Title Ins. Co., 59 A.3d 1280, 1283 (Me. 2013)). "Because the duty to defend is broad, any ambiguity in the policy regarding the insurer's duty to defend is resolved against the insurer, and policy exclusions are construed strictly against the insurer." Mitchell, 36 A.3d at 879 (citations omitted). At the same time, courts may "not speculate about causes of action that were not stated" in the complaint. York Golf & Tennis Club v. Tudor Ins. Co., 845 A.2d 1173, 1175 (Me. 2004).

-9-

We first address whether Northern Assurance had a duty to defend LMB in the arbitration proceeding. LMB concedes that "the 'your product' exclusion serves to exclude coverage for any property sold, handled, distributed or disposed of by" LMB, which includes the allegedly defective yacht. But, LMB argues, Northern Assurance nonetheless owed a duty to defend it in the arbitration proceeding because "the allegations in the Arbitration Complaint provide a basis for Russ Irwin to prove damage to his own or others' personal property, which would fall within the ambit of coverage under the Policy as unexcluded 'property damage.'"

This argument fails. As the district court correctly observed,

> [Irwin's] Arbitration Demand is strident, but simple. It complains about the failure to build the yacht as promised, as well as overbilling. . . . [T]he claims for economic damage . . . . all have to do with what the buyer paid, the difference in value between the yacht as promised and actually delivered, and the value of the buyer's time, expense and burdens in dealing with the boatyard while trying to obtain satisfaction. There is no suggestion that somehow the yacht's defects damaged <u>other</u> property. There is no suggestion, for example, that the buyer put cushions and equipment on the yacht that were damaged on account of defects.

Lyman I, 2013 WL 5435204, at *4. Thus the complaint did not allege any facts that even suggest the potential for a covered claim.

Plaintiffs resist this conclusion, pointing out that, in the course of alleging constructive fraud, Irwin alleged that LMB

-10-

and Cabot Lyman "breached the trust and confidence which [Irwin] entrusted with them in the failed construction and completion of the Vessel and in putting [Irwin]'s life, limb and property and those of his family and loved ones at risk on the oceans and at sea." But this passing reference to a "risk" to property is not sufficient to trigger a duty to defend under Maine law.

In <u>Baywood Corp.</u> v. <u>Maine Bonding & Casualty Co.</u>, 628 A.2d 1029 (Me. 1993), the Maine Law Court found that a complaint alleging that the insured inadequately designed a sewer system for a condominium complex did not fall within the coverage of a CGL policy because it sought only "the cost to replace or upgrade the [sewer] system." <u>Id.</u> at 1031. Although "the complaint refer[red] generally to property damage," the Law Court explained, it "allege[d] no physical damage to the [condominium] units." <u>Id.</u> Thus, the insurer had no duty to defend. <u>Id.</u>

So it is here. While referring generally to a "risk" to personal property, Irwin's arbitration complaint did not allege any damage to such property or request any relief for personal property damage. Instead, the complaint requested several specific items of relief related to the damage sustained by the defective vessel itself and the expense that Irwin went to in discovering and attempting to rectify its defects. "[B]ecause [Irwin's] complaint d[id] not allege actual damage to property but rather s[ought] damages for replacing defective workmanship, which is a business

-11-

risk specifically excluded from the policy, [Northern Assurance] ha[d] no obligation to defend the underlying action."  Id.

Plaintiffs erroneously argue that because the arbitration complaint did not foreclose the possibility that Irwin's personal property was damaged, LMB was entitled to a defense.  That is not a correct statement of the law.  If plaintiffs' articulation of the duty to defend were correct, that would make the duty virtually limitless.[4]  More specifically, it would run afoul of the Maine Law Court's admonition that courts adjudicating the duty to defend may "not speculate about causes of action that were not stated" in the complaint.  York Golf & Tennis Club, 845 A.2d at 1175.

The cases upon which plaintiffs rely do not in fact support plaintiffs' overly broad articulation of the duty to defend.  They are readily distinguishable from this case.  In Auto Europe, LLC v. Connecticut Indemnity Co., 321 F.3d 60 (1st Cir. 2003), the underlying complaint alleged that Auto Europe had fraudulently overcharged its customers in violation of the Maine Unfair Trade Practices Act (UTPA).  Id. at 63, 66-67.  The court held that Auto Europe was entitled to a defense from its insurance company notwithstanding a policy exclusion for "willfully dishonest

---

[4]     The same goes for plaintiffs' contention at oral argument that Northern Assurance owed a duty to defend based on the complaint's request "[f]or such other and further relief as the Court deems just and proper."  If an insurer were required to defend simply because a complaint includes a catchall request for all "just and proper" relief, the duty to defend would be triggered in virtually every case, contrary to the contours of Maine law.

or fraudulent acts" because the Maine UTPA "permit[ted] liability in the absence of an intent to deceive," so "it [was] possible . . . that the facts as developed at trial would reveal an improper practice that was unaccompanied by an intent to deceive." Id. at 67-68. Similarly, in Mitchell, the Maine Law Court held that Mitchell was entitled to a defense against a complaint that alleged that he converted lobster fishing equipment, notwithstanding a policy exclusion for intentional acts, because the complainant, Ames, could have established that Mitchell committed conversion by "accidentally interfer[ing] with Ames's rights." 36 A.3d at 880-81. Finally, in Howe, the Law Court held that the insurer had a duty to defend a nuisance and negligence lawsuit arising out of the conduct of the insured condominium owner's dog because the complaint alleged that the dog had "bitten people" and that other "unit owners ha[d] been assaulted" by the dog, and thus alleged "bodily injury" potentially covered by the insurance policy. See 95 A.3d at 81.[5] Thus, in Auto Europe, Mitchell, and Howe, the court found a duty to defend because there

_____

[5]     Counsel for LMB stated at oral argument that, in Howe, the Law Court determined that "there was a duty to defend because it [was] possible, though never alleged in the complaint, that the dog could have done property damage to [condominium] Association property." This was an argument that Howe's counsel made in her brief, see Howe, 95 A.3d at 81, but the court did not explicitly accept (or reject) it. The court explicitly found a duty to defend because the complaint "outline[d] a claim of bodily injury for which Howe might be answerable to the [condominum] Association, depending on the facts developed as the case proceeds." Id. (emphasis added).

-13-

was a theory of liability under a cause of action <u>actually pleaded</u> that would have afforded insurance coverage.  Here, in contrast, Irwin's complaint -- while specifying in considerable detail the relief sought -- made no claim whatsoever for damage to personal property.  The district court correctly found that Northern Assurance had no duty to defend LMB.

We conclude otherwise as to the court's ruling that Northern Assurance did have a duty to defend Cabot Lyman in the arbitration proceeding because the "your product" exclusion did not apply to him.  We find that the exclusion does apply to Cabot Lyman and thus hold that Northern Assurance had no duty to defend him in the arbitration proceeding.

In interpreting this insurance contract, our task is to "'effect the parties' intentions . . . construed with regard for the subject matter, motive, and purpose of the agreement, as well as the object to be accomplished.'"  <u>State</u> v. <u>Murphy</u>, 861 A.2d 657, 661 (Me. 2004) (alteration in original) (quoting <u>Handy Boat Serv., Inc.</u> v. <u>Prof'l Servs., Inc.</u>, 711 A.2d 1306, 1308 (Me. 1998)).  We must examine the entire agreement, giving the language its plain meaning.  <u>Id.</u> (citing <u>Am. Prot. Ins. Co.</u> v. <u>Acadia Ins. Co.</u>, 814 A.2d 989, 993-94 (Me. 2003)).

The insurance policy defines "your product" as "goods or products . . . manufactured, sold, handled, distributed or disposed of by . . . [y]ou."  The term "[i]ncludes . . . [w]arranties or

-14-

representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product.'" "[T]he words 'you' and 'your' refer to the Named Insured" listed on the policy, and those Named Insureds are LMB, Cabot Lyman, and Heidi Lyman. Thus, the "your product" exclusion, by its plain terms, applies to the products of LMB, Cabot Lyman, or Heidi Lyman, and to damages arising out of warranties or representations made "with respect to the fitness, quality, durability, performance or use" of such products. Cf. Am. First Credit Union v. Kier Constr. Corp., 314 P.3d 1055, 1059 (Utah Ct. App. 2013) (holding that "your product" exclusion in CGL policy on which Broberg was the named insured was properly read to "exclude[] coverage for '[p]roperty damage to [Broberg's] product arising out of it or any part of it'" (second and third alterations in original) (internal quotation marks omitted)). The term "your product" includes the yacht (because it is LMB's product) and the allegedly fraudulent misrepresentations made by Cabot Lyman as president and officer of LMB (because they concerned the quality of the yacht).

Northern Assurance argues that the "your product" exclusion is "not insured-specific" -- the operation of the exclusion does not depend on the identity of the insured against whom the suit is brought. It adds that this must at least be true here, where the other insured, as a corporate officer, has allegedly acted as an alter ego of the corporation that designed

the product, and the policy explicitly precludes coverage for representations made with respect to the quality of the corporate insured's products.[6]  The provision does not exclude property damage to "the insured's product"; it excludes property damage to "your product," a term that, on these facts, includes the yacht even with respect to the suit against Cabot Lyman.

Cabot Lyman and LMB cite no case or policy language that refutes that interpretation of the insurance contract on the facts here.  Instead, they rely on the rule that ambiguities in insurance contracts should be resolved against the insurer.  That rule is inapplicable.  The "your product" exclusion is not ambiguous in its application here.  Irwin's complaint alleged damages to the yacht; the policy excludes damages to "your product"; "you" is defined as, inter alia, LMB; the yacht is LMB's product; thus, the policy unambiguously excludes the allegations of the complaint. Accordingly, on these facts, we find that Northern Assurance had no duty to defend Cabot Lyman in the arbitration proceeding.

To hold otherwise would undercut the well-recognized purpose of CGL insurance policies, as articulated by the Maine Law Court.  CGL policies are designed to cover "occurrence of harm

---

[6]    We need not address whether the "your product" exclusion would preclude coverage for a claim against an individual officer that is not explicitly included in the policy's definition of "your product."

risks" but not "business risks."  <u>Peerless Ins. Co.</u> v. <u>Brennon</u>, 564

A.2d 383, 386 (Me. 1989).  As the Law Court explained,

> [a]n "occurrence of harm risk" is a risk that
> a person or property other than the product
> itself will be damaged through the fault of
> the [insured].  A "business risk" is a risk
> that the [insured] will not do his job
> competently, and thus will be obligated to
> replace or repair his faulty work.  The
> distinction between the two risks is critical
> to understanding a CGL policy.  A CGL policy
> covers an occurrence of harm risk but
> specifically excludes a business risk.

<u>Id.</u> (quoting Note, <u>Baybutt Construction Corp. v. Commercial Union</u>

<u>Insurance Co.: A Question of Ambiguity in Comprehensive General</u>

<u>Liability Insurance Policies</u>, 36 Me. L. Rev. 179, 182 (1984)).  The

type of harm alleged in Irwin's complaint is, by contrast, a

"business risk" that is excluded under the terms of the CGL policy

Northern Assurance issued to LMB and Cabot Lyman.  There is no

principled reason why that result would change because Irwin named

Cabot Lyman as a defendant on an alter ego theory and for

representations he made as a director and president of LMB about a

yacht manufactured by LMB.  As was recognized in <u>Cle Elum Bowl,</u>

<u>Inc.</u> v. <u>N. Pac. Ins. Co.</u>, 981 P.2d 872 (Wash. Ct. App. 1999), "an

insured director and officer . . . is subject to the same

exclusions that deny coverage to the corporation."  <u>Id.</u> at 877.

We note that a contrary holding would also create

perverse incentives when plaintiffs sue a corporation for defective

workmanship.  If these plaintiffs could trigger a duty to defend on

-17-

the part of the corporation's CGL insurer not otherwise obligated to provide a defense by simply adding a corporate officer or employee as a defendant, they would often have the incentive to do so in order to add another pocket to the other side of the negotiating table. As a consequence, the "your product" exclusion, long a staple of CGL policies, would be rendered a dead letter. We decline to read the policy to allow such a result, absent any evidence, of which there is none, that this was the parties' intent.

### III.

We hold that Northern Assurance did not owe a duty to defend LMB or Cabot Lyman in the underlying arbitration proceeding. The decision of the district court is affirmed in part and reversed in part. We remand for entry of judgment in favor of Northern Assurance. Costs are awarded to Northern Assurance Company of America.